YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.*
GEORGE W. BENT ET AL.

[47 South. 805.]

1. CARRIERS. *Contracts. Freights. Regulations.*

Contracts for the carriage of freights by common carriers are subject to regulations under the law, and when a lawful regulation has been imposed the carrier cannot evade it by any printed form of contract required to be signed by the shipper

2. SAME. *Same. Construction.*

Stipulations in contracts for carriage, inserted entirely for the benefit of the carrier, will be strictly construed.

3. SAME. *Same. Constitutional law. Due process of law. Constitution 1890, sec. 14. Amendment XIV, constitution of U. S. Code 1892, § 4299. Code 1906, § 4851. Interstate commerce.*

Code 1892, § 4851, Code 1906, § 4851, providing that every bill of lading acknowledging the receipt of property for transportation

shall be conclusive evidence in the hands of a *bona fide* holder, as against the carrier, that the property had been so received:—

(*a*) Makes certain acts voluntarily done by a carrier conclusive, creates a substantive rule of law, and is not invalid as depriving the carrier of property without due process of law; and

(*b*) It is not invalid as a regulation of interstate commerce when applied to interstate shipments; and

(*c*) A bill of lading issued by a common carrier describing a shipment of cotton linters as containing a designated number of pounds is conclusive on the carrier as to the weight, in the hands of a *bona fide* holder, although the same contain, printed above the column for the insertion of weights, the words, "Weights subject to correction."

FROM the circuit court of, first district, Hinds county.

HON. WILEY H. POTTER, Judge.

Bent and others, appellees, composing a copartnership doing business under the firm name, "Bent & Company," were plaintiffs in the court below; the railroad company, appellant, was defendant there. From a judgment in plaintiffs' favor defendant appealed to the supreme court. The facts are stated in the opinion of the court.

*Mayes & Longstreet,* for appellant.

*Watkins & Watkins,* for appellees.

[The reporter has been unable to find the briefs of counsel in this case, and for that reason no synopsis of them is given.]

MAYES, J., delivered the opinion of the court.

The controversy in this case arises under Code 1892, § 4299, Code 1906, § 4851. That section is as follows: `

"Every bill of lading or other instrument in the nature or stead thereof acknowledging the receipt of property for transportation, shall be conclusive evidence in the hands of a *bona fide* holder for value, whether by assignment, pledge, or otherwise, as against the person or corporation issuing the same, that the property had been so received."

The substantial facts of the case, as agreed upon in the record, are as follows:

On the 10th day of June, 1905, the railroad company issued to the Buckeye Cotton Oil Company, at Greenwood, Miss., ten bills of lading, covering two hundred and fifty bales of cotton linters, delivered to the railroad company for shipment to Bent & Co., at Boston, Mass., on the order of Hood & Co., of Jackson, Miss., the cotton to be delivered to Bent & Co., Boston, on presentation of the bill of lading. The railroad company duly issued its bills of lading for the cotton and it is agreed that the bills of lading stated on their face that the aggregate was one hundred eighteen thousand, four hundred twenty-five pounds. These bills of lading have, above the column where the weights are to be inserted, the following: "Weights subject to correction." The oil company attached the bills of lading to a sight draft on Hood & Co., of Jackson, Miss., predicating the amount drawn for of the value per pound of the cotton linters as shown by the weights in the face of the bill of lading issued by the railroad company. Hood & Co., received the bills of lading and paid the drafts attached thereto, and forwarded same to Bent & Co., of Boston, Mass., attaching the bill of lading to drafts on Bent & Co., adopting as the basis of the drafts the weights stated in the bills of lading issued by the railroad company. The cotton linters was transported by the Yazoo & Mississippi Valley Railroad Company and connecting carriers, in unbroken packages, from Greenwood, Miss., to Boston, Mass., and delivered to Bent & Co. The same two hundred and fifty bales of cotton linters received by the defendant company at Greenwood were delivered to Bent & Co., in Boston.

The bills of lading, with the drafts attached, drawn by Hood & Co. on Bent & Co., of Boston, were forwarded and paid by Bent & Co., and after payment of same and reweighing the cotton it was ascertained by Bent & Co., the weights were twenty thousand, nine hundred and eighty-four pounds short, aggregating in value $786.90, which amount of shortage was paid in full by Bent & Co. to Hood & Co.; that is to say,

Bent & Co. paid for the quantity of cotton linters which the bills of lading showed had been shipped to them, and without notice of the fact that there was any shortage until after payment, unless the statement in the bill of lading, "weights subject to correction" was notice. It is further agreed that Bent & Co. relied on the weights stated in the bills of lading and that Hood & Co., who shipped the cotton linters to Bent & Co. had no notice or knowledge of any discrepancy in the weight, other than the statement in the bills of lading, that the weights were "subject to correction." It is also agreed that, in paying the freight on the shipment, the freight was paid according to the weight stated in the bill of lading and accepted by the defendant on that basis. The agreement further shows that the cotton linters were not weighed by the railroad company, but that it was customary to permit the oil company to do its own weighing, and in this instance this was done, and the weights were written into the bills of lading by the oil company, and not by the carrier; but the bills of lading were issued and adopted by the carrier as its bills of lading, and nothing in the bills of lading indicated that they were prepared by any party other than the railroad company.

On these agreed facts a judgment was rendered by the trial court in favor of the plaintiff for the sum of $893.37, being principal and interest on the alleged value of the shortage, and from this judgment the defendant appeals.

While the facts show that the oil company placed the weights in the bills of lading for the railroad company, there is no issue of fraud made by the pleadings or the proof; nor is there any contention that the nature of the goods in this case is such that a loss in weight is natural, either from the operation of the elements on the character of goods, or as a natural result of being housed up for a period of time; nor is there any error apparent on the face of the bill of lading of any kind. We merely state these things to show what the real facts of this case are. The facts of this case bring it literally within the rule declared in

the case of *Loyd v. Railroad Company*, 88 Miss. 422, 40 South. 1005, unless this case is to be reversed on the contentions of counsel for appellants on questions raised in this case for the first time, and not decided in the case *supra.*

It is first contended in this case that Code 1906, § 4851, has no application, for the reason that the bills of lading here provide that the weights are "subject to correction." Counsel for appellant therefore contend that, since the court has held in the case of *Hazard v. Illinois, etc., R. Co.,* 67 Miss. 32, 7 South. 280, that the statute in question is not a mere rule of evidence, but designed to change the character and legal effect of the contract evidenced by the bill of lading, therefore, say counsel for appellant, the party who takes under the bill of lading must take in accordance with the whole contract as formed by the statute and the bill of lading, and, since the bill of lading provides that the weights are subject to correction, this provision cannot be repudiated by a party claiming to be a *bona fide* holder of the bill of lading, since by its very terms the bill of lading puts the party on notice of its right to correct discrepancies in weights. If this contention be sound, the statute in question would be of little use, since, by stamping on the face of every bill of lading that the weights were subject to correction, it would have the effect of writing out of the law this statute. These bills of lading cannot be considered as contracts in the ordinary sense in which the word "contract" is used. A common carrier owes a duty to the public not imposed upon an individual. Such contracts are subject to regulation under the law, and when a lawful regulation has been imposed it is not within the power of the carrier to destroy the regulation by any printed form of contract required to be signed by shippers. As was said in the case of *Laskey v. Southern Express Company,* 92 Miss. 268, 45 South. 869: "Stipulations in shipping contacts of the character under discussion are made entirely for the benefit of the carrier, and will receive strict construction, to the end that through it just claims of shippers may not be defeated by dilatory methods in

handling the claim. These stipulations are made on the back of contracts of shipment, and are rarely read by the shipper, and the one ground upon which they can be upheld is that they are reasonable regulations—not contracts in the true sense." In the case of *Railroad Co. v. Insurance Co.*, 79 Miss. 114, 30 South. 43, the court said: "The common carrier must at all times be ready and willing to contract with the shipper on the terms and conditions imposed by law. If the carrier desire to limit its common-law liability, it can only do so by special contract with the particular shipper, freely and fairly entered into, and upon sufficient consideration." When the rule laid down in these two cases is applied, it is seen that this court has repudiated the idea that these printed stipulations may be given the force of a contract, fully, freely, fairly, and voluntarily entered into by private parties, but regards such stipulations more as regulations made by the carrier for its own benefit, the validity of which must depend on reasonableness and consistency with the general law.

The next contention of counsel for appellant is that the statute itself is void, because it violates section 14 of the Constitution of the state, and the fourteenth amendment to the Constitution of the United States, in that it undertakes to prescribe a conclusive rule of evidence, thereby taking away from the courts their constitutional powers to investigate and pass upon facts, resulting in a deprivation of property without due process of law. In support of this contention one case is cited. That case is *Missouri, etc., Ry. Co. v. Simonson*, 64 Kan. 802, 68 Pac. 653, 57 L. R. A. 765, 91 Am. St. Rep. 248, decided by the Kansas supreme court on a statute not identical with, but similar to, the statute under discussion. We shall notice this decision later. Suffice it to say here that this decision was rendered by a court consisting of seven judges, three of whom dissented, and this case stands alone in its holding, so far as any other case has been cited by counsel, and in so far as a most painstaking search has revealed to us. The cases cited in the opinion of the majority do not sustain the decision, and are

readily differentiated from the question the court was consider-
ing, while the dissenting opinion, amply supported by authority
from the supreme court of the United States and other courts,
is by far the stronger and the correct view.   In the case of
*Hazard v. Illinois, etc., R. Co.,* 67 Miss. 32, 7 South. 280, this
court has already held that this statute was not a mere rule of
evidence, but was designed to change the character and legal
effect of the contract evidenced by the bill of lading.   So, we
see, in the case above cited, we have a declaration by this court
that, though the legislature has spoken of this statute as furnish-
ing conclusive evidence, etc., it is in truth not a statute merely
enacting a rule of evidence, but making certain acts, voluntarily
done by the railroad company, operate by way of estoppel to es-
tablish an incontrovertible contractual liability.   In short, it
precludes the railroad company from showing the untruth of
that which they have asserted to be true in their bill of lading
when same reaches the hands of a *bona fide* holder for value.
This statute creates a substantive rule of law, the end and aim
of which is to promote justice, accuracy, and fairness.   Mr.
Wigmore, in his work on Evidence, in a note to be found in vol-
ume 2, p. 1667, says: "Legislators frequently seem to believe
that something is gained by labeling such statutes rules of evi-
dence."   But, when the effect of the statute is to create a rule of
substantive law, the statute cannot be invalidated because of its
label.   Again, in volume 2, p. 1665, § 1353, same authority, it
is said: "So far as a so-called rule conclusive evidence is not
a rule of evidence at all, but a rule of substantive law, it is clear
that the legislature is not infringing upon the prerogative of the
judiciary."   Again, in section 1354, paragraph 1, it is stated
that: "A statute which makes more stringent the rule of respon-
sibility for a tort, by substituting some other tests than negli-
gence, is constitutional.   So, also, a statute which enlarges the
rules of contract by creating an estoppel is constitutional, as
when the terms of a bill of lading or of a policy of insurance are
declared to be 'conclusive' in certain respects."  .
    In the case of *Orient Ins. Co. v. Daggs,* 172 U. S. 557, 19

Sup. Ct. 281, 43 L. Ed. 552, the supreme court of the United States upheld a Missouri statute compelling fire insurance companies, in case of total loss, to pay the amount for which the property was insured, less depreciation between the time of issuing the policy and the time of loss, holding that such a statute did not deprive the insurer of property without due process of law, because it left the parties to fix the valuation of the property as they chose, merely making their action conclusive after they had voluntarily entered into it. In this case the court said the insurers are left "to fix the valuation of the property upon such prudence and inquiry as they choose. It only ascribes estoppel after this is done—estoppel, it must be observed, to the acts of the parties, and only to their acts in open and honest dealing." The court further said that the law only made these contracts of insurance "true contracts of assurance, not seemingly so, but really so; not only when premiums are paying, but when loss is to be paid. The state surely has the power to determine that this result is desirable, and to accomplish it even by a limitation of the right of contract claimed by plaintiff in error." The statute under discussion is a statute similar to the Missouri statute. The statute operates by way of estoppel, and makes the bill of lading containing the weights on which the railroad company collect freight the true weight. By this statute it is precluded from making its weights the basis on which to collect freight merely; but in the hands of a bona fide holder for value, who has purchased the goods on the faith of the weight promulgated by it; it is estopped from afterwards denying it to be the true weight.

In the case of *Missouri Ry. v. Simonson,* 64 Kan. 802, 68 Pac. 653, 57 L. R. A. 765, 91 Am. St. Rep. 248, the statute was different from the statute here. The Kansas statute made the bills of lading conclusive proof as to the weight stated therein, not in the hands of a bona fide holder for value, as is the case with our statute, but in the hands of all parties. The dissenting opinion in the above case clearly shows that the opinion of

the majority is unsound and that the authorities relied on therein do not support it. Chief Justice Doster, in dissenting in the above case, says: "I dissent from the judgment of the majority of the court that the Legislature may not give to the receipt contained in a bill of lading issued by a common carrier a conclusive effect as evidence of the weight of the thing receipted for, and am authorized to say that Justices Smith and Ellis likewise dissent. A proposition in denial of the legislative power in the case stated is incomprehensible to me. There is not a case in the books which in principle or in similarity of facts affords ground for the majority opinion. The instances in which the exercise of the power in question has been attempted are not numerous. Nearly all of them were cases in which the Legislature sought to give tax deeds a conclusive effect to establish the substantive rightfulness of tax-sale proceedings. This class of cases was not adverted to by the majority, because of the obvious fact that in such cases the act from which it was sought to derive a conclusive effect was clearly the act of an adversary party, and the effort was to find those in which the Legislature had exceeded its authority by undertaking to found a presumption of conclusiveness upon the act of the party himself This could not be done. There are no such cases; that is, there are no cases in denial of the legislative right to found an estoppel upon the contract act of a party, and that—and it alone—is the case in hand. There are, however, decisions of a different character, which my associates have mistakenly regarded as authority for their holding. For instance, in one of them, as cited in the majority opinion, it appeared that the Legislature had declared a conclusive presumption of negligence from the killing of live stock (*Little Rock & Ft. S. R. Co. v. Payne,* 33 Ark. 816, 34 Am. Rep. 55); in another it declared a conclusive presumption of assent to a trespass from a failure to aply to the courts to enjoin it (*Meyer v. Berlandi,* 39 Minn. 438, 40 N. W. 513, 1 L. R. A. 777, 12 Am. St. Rep. 663); in another it declared an officially published schedule of

railway rates conclusive evidence of their reasonableness (*Chicago, M. & St. P. R. R. Co. v. Minnesota,* 134 U. S. 418, 10 Sup. Ct. 702, 33 L. Ed. 970, 3 Interst. Com. R. 209); and in another case it sought to make a minor's declaration as to his age conclusive on his legal guardians (*Wantlan v. White,* 19 Ind. 470). It must be observed that in the cases of the tax deeds and the schedule of railway rates and the minor's enlistment oath the Legislature sought to bind interested parties by the adversary action of others, not by any action of their own, and in the cases of the imputed negligence and the imputed assent to the trepass sought to bind them by accidental circumstances involving them in no manner of contractual relation. Manifestly all such cases are to be governed by a principle different from that to be applied when it is sought to found the presumption on the conventional act or agreement of the party himself. I may well object to a law which from the hostile act of another seeks to raise against me a conclusive presumption, and I may well object to a law which seeks to found an estoppel against me upon some undesigned and easily explicable circumstance; but I can have no objection to a law which merely seeks to give to my own deliberate business engagement a conclusive and irrevocable effect. Judge Cooley notes the distinction between the two classes of cases in the very quotation made from him in the majority opinion. In discussing the subject of the power of the Legislature over the rules of evidence, he says: 'Except in those cases which fall within the familiar doctrine of estoppel at the common law, or other cases resting upon the like reasons, it would not, we apprehend, be in the power, of the Legislature to declare that a particular item of evidence should preclude a party from establishing his rights in opposition to it.' The Legislature, therefore, in this case, has rested its enactment on the very exception noted by Judge Cooley, viz., estoppel or like reasons."

And again: "It is true the courts have not elevated a mere receipt to the grade of an estoppel; but they have often held

other like written engagements and declarations of the existence of facts to be such. This has been especially true when one of the contracting parties has done or paid something as a consideration or equivalent for the engagement or declaration. This case, for aught we know, may be one falling within the rule, because here the shipper may have paid freight money on the basis of weight specified in the bill of lading. But admitting as should be done, that the courts have not advanced the doctrine of estoppel to cover such class of cases, ought it to be said that the Legislature is constitutionally powerless to do so—that is, powerless to make that conclusive evidence which the courts themselves hold to be presumptive evidence; powerless, for the sole reason that some instances of meritorious defense on the ground of mistake will be shut out? If we were required to search for reasons for the enactment in question, we would not have to go far. The reason is to be found in the character of railways as common carriers. The relations existing between the public and the carriers make the regulation of the latter in many particulars not merely advisable, but highly important. It cannot be said, therefore, that a statute forbidding the carrier to dispute in court a written admission made by it as a basis of contract liability is an unwarranted exercise of legislative power. It must be borne in mind that the business of a common carrier is one which is 'clothed with a public interest.' That was pithily remarked by Sir Matthew Hale nearly four hundred years ago. It was quoted by the supreme court of the United State in *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77, and made the basis of the decision in that case and in many subsequent ones decided by that and other courts. Now, pretermitting the question as to the power of the Legislature to found a conclusive presumption upon the admissions of private individuals, it cannot be doubted, in my judgment, that it possesses the power to declare that a receipt for goods, given by a transportation company in the conduct of its public business as a common carrier, shall be conclusively deemed and held to express the measure of the liability incurred."

It is thus seen that this case cannot be considered as sound authority for the proposition that this statute is unconstitutional because it violates the due process clause of the Constitution of either the state or the United States.

The third contention of counsel is that the statute is unconstitutional because it is an attempt to regulate interstate commerce, and in support of this proposition cites the cases of *Central R. Co. v. Murphey,* 196 U. S. 194, 25 Sup. Ct. 218, 49 L. Ed. 444, and *Houston, etc., R. R. Co. v. Mayes,* 201 U. S. 321, 26 Sup. Ct. 491, 50 L. Ed. 772. We do not think the cases cited have any bearing on this case. The statute in question attempts no sort of regulation of interstate commerce; neither does it impose any burden on same. All that the statute requires is that, when a bill of lading is issued, it speak the facts correctly. The railroad company owes it as a duty to the purchasers of goods bought on the faith of their statements as to weight that the bills of lading be accurate. The railroad has the power to make its bills of lading accurate. When it does not do so, it is its own neglect, and it should be the sufferer, and not an innocent party suffering by that neglect.

In the case of *Central R. Co. v. Murphey,* 196 U. S. 194, 25 Sup. Ct. 218, 49 L. Ed. 444, there was a Georgia statute which undertook to impose on the initial carrier, as a condition of availing itself of a provision in its contract of transportation that it would assume no liability beyond its own line, the duty of informing the shipper, in writing, when, where, and how, and by which carrier, the freight was lost, damaged, or destroyed, and of giving the names of the parties and their official position, if any, by whom the truth of the facts set out in the information could be established, within thirty days after application to trace same, the initial carrier should be liable just as if the damage had occurred on its own line. The court held the statute of Georgia void as imposing a burden on interstate commerce, and very pointedly said: "The railroad company receiving the freight from the shipper has no means of

compelling the servants of any connecting carrier to answer any questions in regard to the shipment, or to acknowledge its receipt by such carrier, or to state its condition when received; and when it is known by the servants of the connecting company that the object of such questions is to place in the hands of the shipper information upon which its liability for the loss or damage to the freight is to be based, it would seem plain that the information would not be very readily given, and the initial or other carrier could not compel it. The effect of such a statute is direct and immediate upon interstate commerce. It directly affects the liability of the carrier of freight destined to points outside the state, with regard to the transportation of articles of commerce. It prevents a valid contract of exemption from taking effect, except upon a very onerous condition; and it is not of that class of state legislation which has been held to be rather an aid than a burden upon such commerce." The section of the statute brought into review by this case—that is to say, section 4851, Code 1906—may be said to belong to that class of state legislation that is in aid of, rather than a burden upon, interstate commerce. Any legislation which in no way impedes transportation, which does not of itself impose liabilities growing out of the negligence or acts of adversary parties, but merely promotes accuracy, leaving the transportation companies free to contract and free to make all reasonable and lawful regulations, can in no sense be considered as imposing a burden on interstate commerce.

The case of *Houston Ry. Co. v. Mayes,* 201 U. S. 321, 26 Sup. Ct. 491, 50 L. Ed. 772, has no application to this case. That was a case where the Texas statute provided that, if a railroad company failed to furnish cars to a shipper within a certain number of days after requisition in writing had been made by the shipper, the railroad company should be penalized in the sum of $25 per day, excepting only where the failure occurred by reason of strikes or other public calamity. The Supreme Court of the United States declared this statute uncon-

stitutional as a regulation of interstate commerce, and among other things said: "While railroad companies may be bound to furnish sufficient cars for their usual and ordinary traffic, cases will inevitably arise where, by reason of an unexpected turn in the market, a great public gathering, or an unforeseen rush of travel, a pressure upon the road for transportation facilities may arise which good management and a desire to fulfill all its legal requirements cannot provide for, and against which the statute in question makes an allowance." These two cases are easily distinguishable from the case on trial, and these authorities do not in any way sustain the contention of counsel.

In the case of *St. Louis & San Francisco Ry. Co. v. Matthews,* 165 U. S. 1, 17 Sup. Ct. 243, 41 L. Ed. 611, the supreme court of the United States upheld a Missouri statute making the railway company liable for all property destroyed by fire from its locomotives, whether the fire was occasioned by negligence or not. It was not thought in that case that the Missouri statute violated any clause or section of the Constitution of the United States. In the case of *Missouri Ry. Co. v. Simonson,* 64 Kan. 802, 68 Pac. 653, 57 L. R. A. 768, 91 Am. St. Rep. 248, above referred to, the court holds that the Kansas statute referred to is not a violation of the interstate commerce clause of the Constitution of the United States, the court observing that: "It does not regulate rates, nor levy taxes, nor impose restrictions of any kind on commerce between the states. It is a police regulation, designed to promote accuracy in dealings between shippers and carriers."                    *Affirmed.*

WHITFIELD, C. J., delivered the following specially concurring opinion.

Treating the statute involved, and which is assailed as unconstitutional, as impairing the obligation of the contract and depriving of property without due process of law, as one which enlarged the rules of contract, by creating an estoppel, it seems to me clear that such statute is not unconstitutional. Mr. Wig-

more, in volume 2, § 1354, of his work on evidence says this in respect to such a statute: "So, also, a statute which enlarges the rules of contract by creating an estoppel is constitutional, as when the terms of a bill of lading or of a policy of insurance are declared to be 'conclusive' in certain respects." And in so stating the law he clearly approves the doctrine announced by Doster, C. J., in his dissenting opinion in the case of *Missouri, K. & T. R. Co. v. Simonson,* 64 Kan. 802, 68 Pac. 653, 57 L. R. A. 768, 91 Am. St. Rep. 248, decided in 1902. He says that Doster, C. J., put it on the ground that those statutes which bind the interested parties by the adversary action of others may be invalid, but that the statute (identical with our statute) merely applied the doctrine of estoppel to the party's own act. I think this is the exact statement of the correct principle on this subject. What this statute does is to hold that the railroad company, issuing a bill of lading under this statute, and under the circumstances clearly shown in the opinion in chief in this case, is simply estopped to contradict the recitation in the bill of lading as to the weights of the cotton received and transported by it.

It is earnestly insisted for the appellant that the clause, "Weights subject to correction," is a term of this contract, and that, even treating the contract as composed of the bill of lading and also this statute written into the bill of lading, this statute is unconstitutional, because it deprives the railroad company of its property without due process of law, and also impairs the obligation of this term of the contract—"Weights subject to correction." I think this argument as to the unconstitutionality of this clause of this statute is fully answered by giving to this clause its manifest meaning. What is that meaning? Just this: That all such variations in weight as may be due to natural causes, atmospheric conditions, mistakes in addition, appearing on the face of the bill of lading, and other such incidental variations in weight, may be corrected; and this correction of these incidental and nonessential variations in weight

manifestly would have been allowed under the general law, without reference to any such clause in the statute. But such corrections as to weights as have the tremendous effect of changing the weights by so much as one-half, one-third, or one-fifth, or other manifestly substantial proportion, never were intended to be allowed by his clause in the statute; and since the whole argument assailing the constitutionality of this clause of the statute is based solely on the erroneous interpretation of this clause, which would make it have this latter meaning, that argument, since that interpretation is manifestly unsound, falls at once to the ground.     ·                *Affirmed.*