---

(No. 10856.—Reversed and remanded.)
THE SHELLABARGER ELEVATOR COMPANY, Appellee, *vs.* ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.

*Opinion filed April 19, 1917—Petition stricken June 6, 1917.*

1. CARRIERS—*section 1 of act regulating transportation of grain requires weighing the grain regardless of desire of shipper.* The requirement of section 1 of the act regulating the transportation of grain (Hurd's Stat. 1916, p. 2092,) that railroads shall accept grain for transportation "when desired by the shipper" has no application to the requirement that the grain shall be weighed, and such grain must be weighed regardless of the desire of the shipper.

2. SAME—*the statute requiring railroad companies to maintain scales for weighing grain is not unconstitutional.* The constitution provides that railroad companies shall weigh grain where it is shipped, receipt for the full amount and be responsible for the delivery of that amount, and section 2 of the act relating to the transportation of grain, which requires that railroad companies shall maintain scales for such weighing at places where the shipments amount to 50,000 bushels a year, is therefore not invalid as special or class legislation.

3. SAME—*statute making sworn statement of shipper conclusive as to weight is unconstitutional.* The provision in sections 1 and 2 of the act regulating the transportation of grain, (Hurd's Stat. 1916, p. 2092,) making the sworn statement of the shipper conclusive as to the weight of the grain shipped where the carrier has neglected or refused to weigh the same, is unconstitutional, as the legislature has no power to make such sworn statements conclusive evidence.

4. SAME—*term "sworn statement" as to weight of grain refers to affidavit as well as oral testimony.* The term "sworn statement," used in the act for the regulation of the transportation of grain, refers to a statement in form of an affidavit as well as to oral testimony on the witness stand.

5. SAME—*action by shipper for loss in weight of grain shipped is not a suit on the bill of lading.* An action by the shipper against

the carrier to recover for loss in weight of grain shipped, due to a failure to safely carry the grain, is not a suit on the bill of lading, and such action may be brought for loss in an inter-State shipment due to the defendant's negligence, without regard to the provisions of the Carmack amendment.

6. SAME—*clause in a bill of lading exempting carrier from liability for difference in weights of grain is contrary to public policy.* A clause in the conditions on the back of a bill of lading exempting the carrier from liability for difference in the weights of grain caused by discrepancies in elevator weights is contrary to public policy.

7. SAME—*object and meaning of section 4 of article 13 of constitution, regarding transportation of grain.* Section 4 of article 13 of the constitution, requiring the weighing of grain by carriers, is intended to protect shippers and producers against short weights in delivery, and means that the railroad company or carrier shall be responsible for the delivery at destination of the full weight of grain received unless excused by the act of God or the public enemy or the negligence of the shipper but is not intended to make the carrier an insurer.

8. CONSTITUTIONAL LAW—*authority of legislature to· establish rules of evidence.* The legislature may establish rules of evidence and declare that a fact from which an inference of another fact may reasonably be drawn shall be regarded as evidence of the latter fact, but it cannot declare that the existence of the first fact shall conclusively establish the existence of the second.

9. SAME—*when constitutional part of an act will be given effect and the unconstitutional part disregarded.* The constitutional part of a statute will be given effect and the unconstitutional part disregarded provided the unconstitutional part is of such a character that it may be inferred the legislature would have passed the act without it, but the question is one of legislative power and not of verbal form.

10. AFFIDAVITS—*when it may be inferred that affidavits were made upon personal knowledge.* Where witnesses who have previously made affidavits as to certain facts giving rise to the suit testify on the trial that they are unable to recall all the circumstances but that they have access to memoranda from which they can refresh their memory it may be inferred that the affidavits were made upon personal knowledge.

FARMER and CARTER, JJ., dissenting.

APPEAL from the Circuit Court of Macon county; the Hon. WILLIAM K. WHITFIELD, Judge, presiding.

CREA & HOUSUM, CHARLES C. LEFORGEE, THOMAS W. SAMUELS, and GEORGE W. BLACK, (JOHN G. DRENNAN, of counsel,) for appellant.

VAIL, MILLER & POGUE, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Shellabarger Elevator Company recovered a judgment in the circuit court of Macon county for $37.43 in an action of assumpsit against the Illinois Central Railroad Company, which has appealed. The action was for the loss of grain shipped in transit and the declaration consisted of seven counts, each based upon the separate shipment of a car from a station in Macon county on the defendant's railroad. Three of the cars were shipped from Forsyth to Peoria, one from Emery to Peoria, one from Argenta to Chicago and two from Argenta to New York. The bills of lading for the last two contained a notation, "Stop at Chgo. for inspection & wts." The plaintiff claimed that there was a deficiency in the grain in each car when delivered from the amount received, varying from 250 to 850 pounds. The appeal is brought to this court directly because it involves the constitutionality of section 1 of the "act regulating the receiving, transportation and delivery of grain," etc. (Hurd's Stat. 1916, p. 2092.) The first two sections of that act are as follows:

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That every railroad corporation, chartered by or organized under the laws of this State or doing business within the limits of the same, when desired by any person wishing to ship any grain over its road, shall receive and transport such grain in bulk, within a reasonable time, and load the same either upon its track, at its depot, or in any warehouse adjoining its track or side-track, without distinction, discrimination or favor between one shipper and another, and without distinction or

discrimination as to the manner in which such grain is offered to it for transportation, or as to the person, warehouse or place to whom or to which it may be consigned.

"WEIGHING IN—RECEIPT. And at the time such grain is received by it for transportation, such corporation shall carefully and correctly weigh the same, and issue to the shipper thereof a receipt or bill of lading for such grain, in which shall be stated the true and correct weight.

"WEIGHING OUT—SHRINKAGE. And such corporation shall weigh out and deliver to such shipper, his consignee or other person entitled to receive the same, at the place of delivery, the full amount of such grain, without any deduction for leakage, shrinkage or other loss in the quantity of the same.

"DAMAGES. In default of such delivery, the corporation so failing to deliver the full amount of such grain shall pay to the person entitled thereto the full market value of any such grain not delivered at the time and place when and where the same should have been delivered.

"EVIDENCE—SHORTAGE. If any such corporation shall, upon the receipt by it of any grain for transportation, neglect or refuse to weigh and receipt for the same, as aforesaid, the sworn statement of the shipper, or his agent having personal knowledge of the amount of grain so shipped, shall be taken as true, as to the amount so shipped; and in case of the neglect or refusal of any such corporation, upon the delivery by them of any grain, to weigh the same, as aforesaid, the sworn statement of the person to whom the same was delivered, or his agent having personal knowledge of the weight thereof, shall be taken as true, as to the amount delivered. And if, by such statements it shall appear that such corporation has failed to deliver the amount so shown to be shipped, such corporation shall be liable for the shortage, and shall pay to the person entitled thereto the full market value of such shortage, at the time and place when and where the same should have been delivered.

"Sec. 2. At all stations or places from which the shipments of grain by the road of such corporation shall have amounted during the previous year to fifty thousand (50,-000) bushels or more, such corporation shall, when required so to do by the persons who are the shippers of the major part of said fifty thousand bushels of grain, erect and keep in good condition for use, and use in weighing grain to be shipped over its road, true and correct scales, of proper structure and capacity for the weighing of grain by car-load in their cars after the same shall have been loaded.   Such corporation shall carefully and correctly weigh each car upon which grain shall be shipped from such place or station, both before and after the same is loaded, and ascertain and receipt for the true amount of grain so shipped.   If any such corporation shall neglect or refuse to erect and keep in use such scales when required to do so as aforesaid, or shall neglect or refuse to weigh in the manner aforesaid any grain shipped in bulk from any station or place, the sworn statement of the shipper, or his agent having personal knowledge of the amount of grain shipped, shall be taken as true as to the amount so shipped. In case any railroad corporation shall neglect or refuse to comply with any of the requirements of section first, second and fifth of this act, it shall in addition to the penalties therein provided, forfeit and pay for every such offense and for each and every day such refusal or neglect is continued the sum of one hundred dollars ($100), to be recovered in an action of debt before any justice of the peace, in the name of the People of the State of Illinois, such penalty or forfeiture to be paid to the county in which the suit is brought, and shall also be required to pay all costs of prosecution, including such reasonable attorney's fees as may be assessed by the justice before whom the case may be tried."

In order to prove the weight of the grain shipped, the plaintiff, besides the bills of lading, introduced in evidence

278 — 22

the affidavits of its agents at the respective stations of shipment as to their personal knowledge of the weight of grain delivered into each car, as authorized by section 1.

The appellant insists that the requirement that railroad companies shall weigh grain upon its delivery to them for shipment is unconstitutional because it is unreasonable and because it is class legislation, relating to one kind of carrier and to one kind of commodity. The appellant argues, first, that section 1 requires the weighing of grain only when desired by the shipper. But this is not in accordance with the language of the section, which in the first sentence requires the railroad company to receive and transport grain in bulk, when desired. This limitation has no application to the second requirement of the act, that at the time of the receipt of grain for transportation the railroad company shall weigh it and issue a receipt or bill of lading for it.

Counsel for the appellant also contend that the first section applies only to shipments of less than car-load lots, and their argument is based on the fact that the second section deals with shipments of grain in car-loads, only, and that if the first section also refers to shipments in car-loads it covers the same subject matter as the second section and the second is wholly unnecessary. The argument assumes that if the first section applies to car-load lots it requires the railroad company to install at every station where it receives grain, scales of sufficient capacity to weigh car-loads of grain. But the two sections of the act are not based on any such assumption. The first section does not attempt to direct the kind or capacity of scales which shall be installed. It merely requires that the grain shall be weighed,—not that it shall all be weighed at one draft. It no doubt assumes that at smaller stations where grain is not shipped in large quantities scales of sufficient capacity to weigh car-loads are not necessary and that the grain might be weighed on other scales, but in cases where shipments for a year have amounted to as much as 50,000 bush-

els it is assumed that the public convenience reasonably requires the weighing of the grain in car-loads, and for that reason section 2 was passed, requiring the installation of such scales upon the request of the shippers of the greater part of the grain.

It is contended that it is unreasonable to require railroad companies to maintain scales for weighing grain at every station where grain is received for shipment. Sections 4 and 6 of article 13 of the constitution are a sufficient answer to this contention as well as to the contention that section 1 is class legislation. Those sections are as follows:

"Sec. 4. All railroad companies and other common carriers on railroads shall weigh or measure grain at points where it is shipped, and receipt for the full amount, and shall be responsible for the delivery of such amount to the owner or consignee thereof, at the place of destination."

"Sec. 6. It shall be the duty of the General Assembly to pass all necessary laws to prevent the issue of false and fraudulent warehouse receipts, and to give full effect to this article of the constitution, which shall be liberally construed so as to protect producers and shippers. And the enumeration of the remedies herein named shall not be construed to deny to the General Assembly the power to prescribe by law such other and further remedies as may be found expedient, or to deprive any person of existing common law remedies."

When the constitution provides that railroad companies and common carriers on railroads shall weigh or measure grain at points where it is shipped and receipt for the full amount and be responsible for the delivery of such amount to the consignee at the place of destination, the court can not say that such requirement is unreasonable or that it is class or special legislation in violation of another provision of the constitution. The constitution itself has put common carriers on railroads in a class by themselves among carriers and grain in a class by itself among com-

modities to be carried, and the legislature does not violate the constitution by following the same classification.

It is further contended that that part of section 1 is unconstitutional which provides that the sworn statement of the shipper or his agent having personal knowledge of the amount of grain shipped shall be taken as true as to the amount shipped, and the sworn statement of the person to whom the grain is delivered or his agent having personal knowledge of the weight shall be taken as true as to the amount delivered, and that if it shall appear by such statements that the corporation has failed to deliver the amount so shown to be shipped the corporation shall be liable for the shortage, because it amounts to the taking of property without due process of law and takes away the constitutional right to a trial by jury. There is no doubt about the power of the legislature to establish rules of evidence, to change the burden of proof, or to declare that a fact from which an inference as to the existence of another fact may reasonably be drawn should be regarded as evidence of the latter fact, (*People* v. *McBride,* 234 Ill. 146; *Waugh* v. *Glos,* 246 id. 604;) but it is not competent for the legislature to declare, in such case, that the existence of the first fact shall conclusively establish the existence of the second. (*People* v. *Rose,* 207 Ill. 352; *People* v. *Baltimore and Ohio Southwestern Railroad Co.* 246 id. 474.) In the first case cited we said that it was not within the power of the legislature to declare what shall be conclusive evidence, as that would be an invasion of the power of the judiciary.

The trial court admitted the affidavits of the agents in evidence and instructed the jury that they should be taken as true as to the amount of grain received and delivered. He also gave an instruction that if any of the affidavits as to the corn loaded had been shown to be false and untrue such affidavits should not be considered. Some evidence was admitted on the part of the defendant as to the con-

dition of the cars in which the grain was shipped and their inspection. The view of the court is not very clearly shown by the record, but it is apparent that he permitted the statements to be received as true as to the weight of the grain shipped and not subject to contradiction, though some of his rulings seem inconsistent with that view. It was held by the Supreme Court of Mississippi that a statute which makes the receipt of property for transportation contained in the bill of lading conclusive evidence in the hands of a *bona fide* holder for value that the property had been so received was a constitutional exercise of legislative power, (*Yazoo and Mississippi Valley Railroad Co.* v. *Bent*, 94 Miss. 681,) while the Supreme Court of Kansas held a statute unconstitutional which made the bill of lading conclusive proof in favor of the consignee of the amount of grain, seed or hay received by a railway company. (*Missouri, Kansas and Texas Railway Co.* v. *Simonson*, 64 Kan. 802.) The United States Supreme Court in *Orient Ins. Co.* v. *Daggs*, 172 U. S. 557, affirming a judgment of the Supreme Court of Missouri, held that a statute providing that in actions upon insurance policies the defendant should not be permitted to deny that the property insured was worth, at the time of issuing the policy, the full amount insured therein on said property, and in case of total loss of the property insured the measure of damages should be the amount for which the same was insured, less whatever depreciation in value below the amount for which the property is insured the property may have sustained between the time of issuing the policy and the time of the loss, did not deprive the insurer of property without due process of law and was not invalid. This decision, like that in the Mississippi case, was based upon the doctrine of estoppel. The statute, the court says, "makes no contract for the parties. In this it permits absolute freedom. It leaves them to fix the valuation of the property upon such prudence and inquiry as they choose. It only prescribes estoppel after

this is done,—estoppel, it must be observed, to the acts of
the parties, and only to their acts in open and honest deal-
ing. Its presumptions cannot be urged against fraud, and
it permits the subsequent depreciation of the property to
be shown." In all these cases the courts were dealing with
voluntary contracts entered into between parties in view
of the existing law making statements of quantity or value
conclusive. In the Mississippi case cited the court said:
"The statute operates by way of estoppel, and makes the
bill of lading containing the weights on which the railroad
company collects freight the true weight. By this statute
they are precluded from making their weights the basis on
which to collect freight, merely, but in the hands of a *bona
fide* holder for value who has purchased the goods on the
faith of the weight promulgated by them they are estopped
from afterward denying it to be that true weight." The
present case is different. It is not the bill of lading or any
contract, statement or claim of the appellant which is de-
clared to be conclusive evidence against it. The statute
does not operate on any contract, but declares that the
sworn statement of its adversary in the litigation shall be
considered evidence against the railroad company. The
case is similar, in principle, to *Vega Steamship Co.* v. *Con-
solidated Elevator Co.* 75 Minn. 308. The statute of Min-
nesota provided for a State weighmaster, who should su-
pervise and have exclusive control of the weighing of grain
and other property subject to inspection, except when other-
wise ordered or directed by the shipper, and the action and
certificate of the weighmaster and his assistants in the dis-
charge of their duties was made conclusive evidence as to
the matters contained in their certificates. In an action
brought for the deficiency in weight of a cargo, the court
held that it was not constitutional for the legislature to
make such certificate conclusive; that the legislature could
not in this matter provide for the arbitrary exercise of
power so as to deprive a person of his day in court to vin-

dicate his rights, and that a law which closes his mouth absolutely when he comes into court is the same, in effect, as a law which deprives him of his day in court.

It is argued on behalf of the appellee that by neglecting or refusing to weigh the grain the appellant consented that the sworn statement of the shipper might be taken as true, and the agreement thus sought to be inferred is likened to the election provided for in the Workmen's Compensation act. (*Deibeikis* v. *Link-Belt Co.* 261 Ill. 454.) There is no similarity between the two cases. The Workmen's Compensation act provides an alternative system for the remedies which the common law gives for injuries to workmen. Each system is equally lawful, and every person may elect to which system of laws he shall be subject in the relation of master and servant, and he may from time to time change from one to the other. The act is expressly based upon a voluntary election, and the element of contract or agreement is an essential part of its terms. The act here in question has nothing to do with contract. Section 1 imposes a duty. By section 2 a penalty of $100 is imposed for each violation of the duty. There is no more to be implied from the violation an agreement to be bound by an unconstitutional provision of the act than there is to be implied a contract to pay the penalty. The law will not imply a contract to do a thing merely because a statute imposes a duty to do that thing. The railroad company becomes liable to the penalty not because of any implied agreement to pay it but because it has violated the law. It becomes liable to the shipper not because of an implied agreement but because it has failed in the performance of a legal duty. A tort feasor is liable for damages not because the law implies an agreement to pay them but because the law imposes the liability. The appellant may be a violator of the law, but it still has the right to insist that it shall not be deprived of its property upon the mere statement of its adversary. It still has a right to a trial by jury and to sub-

mit to the jury evidence on the question of its liability. "To enact a law making evidence conclusive which is not so necessarily in and of itself, and thus preclude a party from showing the truth, would be nothing short of confiscation of property and a destruction of vested rights without due process of law." (*Meyer* v. *Berlandi*, 39 Minn. 438.) The affidavits were admissible as *prima facie* evidence.

The appellant insists that the term "sworn statement" refers to an oral statement on the trial, but the term includes an affidavit as well as oral testimony, and if it had been the intention of the legislature to refer to the testimony of the witness, only, no doubt that term would have been used or such intention would have been made clear.

It is further argued that the provision being unconstitutional in so far as it makes the sworn statement conclusive, is unconstitutional altogether; that it is not separable, so as to make the evidence competent though not conclusive. The rule is well settled that a statute may be in part constitutional and in part unconstitutional, and in such case the constitutional part of the act will be given effect and the unconstitutional part disregarded, unless the unconstitutional part is of such a character that it may be inferred that without it the legislature would not have passed the act. The question is usually presented in cases in which the constitutional and unconstitutional parts of an enactment are contained in separate sections but in such terms that the words constituting the unconstitutional provision may be stricken out. There are cases holding that a statute accomplishing all its results by the same general words in a single section by covering subjects as to which the legislature could and subjects as to which it could not constitutionally enact laws, cannot be restricted, by construction, to the constitutional class because the part applicable to that class is not separable from the part applicable to the unconstitutional class so that each may be read and may stand by itself. But we have treated the question as one of legis-

lative power and not of verbal form, and held that the court will separate statutes valid in part and void in part because in excess of the legislative power, and will disregard the excessive exercise of power and preserve so much as is within the legislative power. (*Scown* v. *Czarnecki, 264* Ill. 305.) It was not within the legislative power to declare the sworn statements conclusive evidence but it was competent to make them admissible as *prima facie* evidence. It was so held in the case of *Vega Steamship Co.* v. *Consolidated Elevator Co. supra.* The provision that the sworn statements shall be taken as true is invalid, but they were properly received in evidence.

It is argued that the persons who swore to the affidavits were examined on the trial and showed that they had then no recollection of the particular facts, and it is insisted that the affidavits were not, therefore, made upon personal knowledge. One of the witnesses testified that he could not recollect anything about any certain cars without his records, and another that he could not recall from memory the cars he loaded but he had memoranda from which he could recall the date and occasion. It is not to be inferred from this that the witnesses had not personal knowledge but rather that they had personal knowledge, though they found it necessary to refresh their memory by reference to their records and memoranda.

The appellant contends that the Uniform Bills of Lading act has repealed section 1 here in question by implication, but does not point out any inconsistencies between the two acts of a material kind which make them so repugnant that they cannot operate together.

The two shipments from Argenta to New York, the bills of lading for which contained the notation, "Stop at Chgo.," were, in fact, stopped, unloaded and delivered in Chicago. The appellee claims that this billing to New York with the privilege of stopping at Chicago was merely to obtain the advantage of a reduction in the freight rate; that

the cars were never intended to go beyond Chicago and that
the shipments were intra-State shipments. The appellant
insists that they were inter-State shipments, and that under
the Carmack amendment the appellee, not being the holder
of the bills of lading, cannot maintain the suit. There is
no evidence in the record that the billing was for the pur-
pose of evading the Inter-State Commerce act or of secur-
ing a reduced freight rate. Apparently the shipments were
inter-State, and they must be so regarded. The appellee
sold the grain according to the weights at the places of de-
livery, and the bills of lading were indorsed and delivered
to the purchasers, surrendered to the railroad company and
canceled. The purchasers of the grain have received and
paid for all they bought, and they have no cause of action
against the appellant. Whatever cause of action there is
must be in the appellee. This cause of action is not on the
bills of lading, but on the failure of the appellant to per-
form its duty to safely carry and deliver the grain. It is
not under the Carmack amendment, which refers only to
the bills of lading. The provisions of the Carmack amend-
ment do not interfere with the right of appellee to recover.

On the back of each of the bills of lading the follow-
ing provisions were printed: "No carrier or party in pos-
session of any of the property herein described shall be
liable for any loss thereof or damage thereto or delay
caused by the act of God, the public enemy, quarantine, the
authority of law or the act or default of the shipper or
owner, or for differences in the weights of grain, seed or
other commodities caused by natural shrinkage or discrep-
ancies in elevator weights." The Uniform Bills of Lading
act provides that a carrier may insert in a bill of lading
any terms or conditions not contrary to law or public pol-
icy which do not impair his obligation to use reasonable
care, and that such terms and conditions shall be binding
upon the consignor receiving such bill and making no ob-
jection in writing to such terms and conditions, so far as

they are not contrary to law or public policy. No objections in writing were made by the consignor to the conditions on the back of the bills of lading, but we regard that clause in the conditions which exempts a carrier from liability for difference in the weights of grain, seed or other commodities caused by discrepancies in elevator weights as contrary to public policy.

The statute requires the railroad company to weigh carefully and correctly grain received for shipment at the time of its receipt, to give a receipt for the true and correct amount and to weigh out and deliver the full amount of such grain, without deduction for leakage, shrinkage or other loss. The statute was passed in compliance with the requirements of section 6 of article 13 of the constitution, which imposed upon the General Assembly the duty of passing all necessary laws to give full effect to article 13, and directed that such article should be liberally construed so as to protect producers and shippers. The object of section 4 was the protection of producers and shippers against short weights in delivery, through which it was thought they were frequently defrauded by the railroad companies out of a part of the grain in each car-load, the loss in each case being small but amounting in the aggregate to a large sum. In the constitutional convention it was said constant complaints were coming up from the farmers of short weights upon shipments, and that the railroad companies were not held, in their own estimation, responsible for the delivery of the same quantity of grain that they received. One member of the convention estimated the various frauds and extortions practiced upon the farmers and shippers by transportation companies, warehouses and the false weights used, at ten millions of dollars a year. To protect producers and shippers from these frauds believed to exist, section 4 of article 13 of the constitution was adopted, requiring railroad companies to weigh or measure grain shipped and receipt for the full amount and to deliver the full

amount at the destination. The natural meaning of the words of this section is that the railroad company shall be responsible for the delivery of the number of pounds of grain it shall have received, and that is the meaning which must be given it. In adopting the constitution this provision was thought so necessary for the protection of shippers upon railroads, on account of the advantage supposed to be possessed by the railroad companies in their dealings with shippers, as to require its embodiment in the fundamental law of the State. It was immediately enacted in the form of a statute by the first legislature after the constitution was adopted, and it would be contrary to the public policy thus indicated to permit it to be nullified by an indorsement on a bill of lading or a contract between a railroad company and its shippers. To do so would be to give to railroad companies the same advantage on account of which the constitutional provision was adopted. We assume that "discrepancy in elevator weights" means difference between weights at the place of delivery and the place of shipment. While the railroad company is responsible for the delivery of the number of pounds of grain received and its receipt in the bill of lading evidence of the quantity received, the constitutional provision was not intended to make the bill of lading an absolute policy of insurance or extend the responsibility of the carrier beyond its responsibility at common law in other respects. It is bound to deliver at the destination the number of pounds of grain received, unless relieved of this obligation to deliver by the act of God or the public enemy or the negligence of the shipper.

Errors are assigned on the rulings of the court on instructions and the admission of evidence, but the material questions have been considered in what has been said and it will not be necessary to consider the rulings in detail.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Mr. JUSTICE CARTER, dissenting:

I do not concur in the conclusion in the foregoing opinion that the legislature cannot, under the circumstances provided by the statute here in question, make the weights of the shipper conclusive under the facts shown on this hearing. I agree, of course, with the statement in the opinion as to the general power of the legislature to prescribe rules of evidence and methods of proof and that such power must be exercised within constitutional limitations. What those constitutional limitations are, as can be readily seen on examination of the authorities, it is somewhat difficult precisely to define. (10 R. C. L. 863.) Judge Cooley, perhaps, has laid down the general rule in as clear a way as anyone, and his rule is generally followed. He says on this subject: "But there are fixed bounds to the power of the legislature over this subject which cannot be exceeded. As to what shall be evidence and which party shall assume the burden of proof in civil cases its authority is practically unrestricted so long as its regulations are impartial and uniform, but it has no power to establish rules which, under pretense of regulating the presentation of evidence, go so far as altogether to preclude a party from exhibiting his rights. Except in those cases which fall within the familiar doctrine of estoppel at the common law, or other cases resting upon the like reasons, it would not, we apprehend, be in the power of the legislature to declare that a particular item of evidence should preclude a party from establishing his rights in opposition to it." (Cooley's Const. Lim.— 7th ed.—526.) Thus, under this doctrine of estoppel it has been held that the fixing of the amount of weight or value of articles may depend upon the elements of estoppel, and that statutes may constitutionally create conclusive rules of law limiting the rights of the parties to prove such amounts incorrect. For example, in the case referred to in the foregoing opinion, (*Orient Ins. Co.* v. *Daggs,* 172 U. S. 557,)

it was held that a statute compelling fire insurance companies, in case of total loss, to pay the amount for which the property was insured, less depreciation between the time of issuing the policy and time of loss, was constitutional, as not depriving the insurer of property without due process of law, because it left the parties to fix the valuation of the property as they chose, merely making their action conclusive after they had voluntarily entered into it. (6 R. C. L. 466.) "Presumptions of law are generally divided into two classes: conclusive and disputable. 'Conclusive, or absolute, presumptions of law are rules determining the quantity of evidence requisite for the support of any averment which is not permitted to be overcome by any proof that the fact is otherwise.' * * * Instruments under seal were once regarded as conclusive evidence of a consideration unless the instrument was impeached for fraud. Receipts under seal were conclusively presumed to import the payment of money. But few of the numerous presumptions formerly called conclusive can now be so classified. At common law, infants under seven are presumed to be incapable of committing crime; a boy under fourteen is conclusively presumed incapable of committing a rape; a female of tender age is conclusively presumed incapable of consenting to sexual intercourse. This age, not having been precisely determined in the common law, was fixed by statute in the reign of Queen Elizabeth at ten years." (Jones on Evidence,— 2d ed.—sec. 11, p. 12.) It has been held that the legislature has no power to make tax deeds conclusive evidence of any jurisdictional fact or fact vital to the exercise of the power of taxation or sale, divesting the title of property for the non-payment of taxes. At the same time, power is confirmed in the legislature to make tax deeds conclusive evidence of compliance with all the requirements of the law which are merely directory and which pertain to the regulation of the manner of exercising the taxing power, and which requirements it might, in the exercise of its discre-

tion, dispense with entirely. (10 R. C. L. 867.) And it is also conclusively presumed, on grounds of public policy, that common carriers have been negligent if goods entrusted to their care have been lost or damaged. (Jones on Evidence,—2d ed.—sec. 15.) So, too, the great weight of authority holds that a conclusive presumption of negligence may be established, resulting from the killing of animals by railroad companies, where the statute requires such companies to erect a fence but where none has been erected. (6 R. C. L. 463.) The rule is generally recognized that when a matter has been adjudicated and finally determined by a competent tribunal the determination is conclusive as between the parties and their privies. Whether the judgment is, in fact, right or erroneous, just or unjust, it can not be collaterally attacked. In such matters the maxim controls, *Interest reipublicæ ut sit finis litium.* (Jones on Evidence,—2d ed.—sec. 585.)

Realizing the evils arising from small losses in the shipment and storing of grain in bulk, the constitutional convention of 1870 inserted article 13 in the constitution for the purpose of guarding against and remedying such evils. Section 4 of that article provides: "All railroad companies and other common carriers on railroads shall weigh or measure grain at points where it is shipped, and receipt for the full amount, and shall be responsible for the delivery of such amount to the owner or consignee thereof, at the place of destination." The other sections of that article provide, among other things, that it is the duty of the General Assembly to pass all necessary laws to prevent the loss of grain in shipment and adopt remedies for such loss. The statute here in question was clearly passed under the authority granted by this article of the constitution. It is the duty of railroad companies, under said section 4, to weigh or measure all grain at the point of shipment and be responsible for the delivery of the full amount at the place of destination. It seems to me that the holding of

the majority opinion will result in making it difficult, if not impossible, to enforce practically these provisions of the constitution. The authorities directly in point on this subject are not numerous. They have practically all been cited in the foregoing opinion. In *Missouri, Kansas and Texas Railway Co.* v. *Simonson*, 64 Kan. 802, it was held by a divided court of four to three, that a statute was unconstitutional which made the specifications of weight in bills of lading issued by a railroad company for goods shipped over its lines conclusive evidence of the correctness of such weights. The Supreme Court of Mississippi, in *Yazoo and Mississippi Valley Railroad Co.* v. *Bent*, 94 Miss. 681, held that such a statute was constitutional, arguing that making the acknowledgment of the receipt of property for transportation contained in the bill of lading conclusive evidence of the fact so stated was constitutional under the common law doctrine of estoppel, citing and relying upon, as authority in so holding, *Orient Ins. Co.* v. *Daggs, supra.*

The legislature may not compel a contract between parties, but may it not declare that a contract which the parties themselves have made should conclusively be presumed to express the obligation which they have entered into? Does this not merely enlarge the rules of contract by creating an estoppel in compelling the common carrier to be bound by the sworn statement of the consignor or consignee as to the weight of the grain shipped or delivered if it does not choose to weigh the grain itself? The constitution and this statute say to the common carrier: You may weigh the grain if you desire; if you do not, you are bound by the provisions of this statute and must take the sworn statement of the consignor or consignee, or his agent, as being correct as to the weight of the grain. Of course, this provision of the statute cannot be held a conclusive presumption as to the weight of the grain and enforced as against a claim for fraud. (See *Orient Ins. Co.* v. *Daggs, supra.*) The late

Justice Brewer, of the Federal Supreme Court, said: "We do not mean that it [the legislature] may, by the mere machinery of rules of evidence, override or set at naught the restrictions of the constitution, or that it could arbitrarily make conclusive evidence of the number of voters any list or roll which in the nature of things has no connection with the fact and does not reasonably tend to prove it; but when it adopts as conclusive evidence of the fact anything which, according to the ordinary rules of human experience, reasonably tends to prove the fact, the courts are not at liberty to ignore or go behind such evidence." *In re County Seat of Linn County,* 15 Kan. 500.

Appellant had the opportunity of weighing the grain here in question when it was shipped. Did it not, in effect, agree, under this statute, that if it failed to do so it would be bound by the sworn statements of the consignor and its agent? The majority opinion says that the reasoning of this court in holding the Workmen's Compensation act constitutional in *Deibeikis* v. *Link-Belt Co.* 261 Ill. 454, and *Crooks* v. *Tazewell Coal Co.* 263 id. 343, is in no way similar to the question here involved. I fully concur that those decisions are not conclusive, but I think the constitutionality of this statute on the question here involved could be upheld by reasoning analogous to that which was adopted in upholding the constitutionality of the Workmen's Compensation act. It is said in this opinion that that act is based upon a voluntary election and in no way upon a penalty. A penalty is enforced by the Workmen's Compensation act if the employer fails to adopt the act. That act, in terms, says that if the employer fails to adopt the act, he or it waives the right thereafter to urge as a defense assumed risk or contributory negligence or the negligence of a fellow-servant as against the injured employee. The depriving of these defenses is placed upon the employer as a penalty for not electing to come under the act, and under the decisions of

this court the law, as to such penalties, has been held constitutional.

As I understand the decision in the case at bar, it holds this statute unconstitutional as depriving appellant of property without due process of law. In *Holden* v. *Hardy*, 169 U. S. 366, the court, in discussing the question of due process of law, says: "This court has never attempted to define with precision the words 'due process of law.' * * * It is sufficient to say that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice and an opportunity of being heard in his defense." "These principles were extended to the right to acquire property and to enter into contracts with respect to property, but it was said 'this right of contract, however, is itself subject to certain limitations which the State may lawfully impose in the exercise of its police powers.'" (*Orient Ins. Co.* v. *Daggs, supra*, on p. 563.) In *Holden* v. *Hardy, supra*, an act of the State of Utah as to the employment of workingmen in all underground mines and workings, and in smelters and all other institutions for the reduction and refining of ores or metals, and limiting, with certain exceptions, the working day to eight hours, was held constitutional. It was said that that statute was undoubtedly a limitation on the right of contract of the employer and of the employed, enforced by a criminal prosecution and penalty on the former and on his agents and managers, but that it was a valid exercise of the police powers of the State. So, too, it was held by similar reasoning in *St. John* v. *New York*, 201 U. S. 633, that the due process of law provision of the Federal constitution was not violated by a provision of the New York statute which prohibited the sale of adulterated milk, even though the seller of the milk offered to prove that it was delivered to him at his creamery or factory

in exactly the same condition as when taken from the cows, the argument being that to forbid the seller of the milk to make this proof was contrary to the constitutional rule of due process of law, the opinion saying (p. 637) : "Not only the final purpose of the law must be considered, but the means of its administration,—the ways it may be defeated. Legislation, to be practical and efficient, must regard this special purpose as well as the ultimate purpose.  *  *  * As the standard established can be proved in the hands of a producing vendor, he is exempt from the penalty; as it cannot certainly be proved in the hands of other vendors so as to prevent evasions of the law, such vendors are not exempt."

It was not necessary in this case for appellant to take appellee's weights.  It could weigh the grain itself if it complied with the provisions of the constitution in the statute touching this question.  But the law presents an alternative to appellant.  It says, Weigh the grain, or take as final the shipper's and consignee's sworn statements of weight.  In order to make this law enforceable there must be some penalty attached to it.  What difference is there, as to the penalty in question, between considering these affidavits of the shipper and consignee as conclusive proof, and a conclusive presumption of negligence arising from the killing of live stock by a railroad company if it fails to fence its railroad as required by statute?  (*Little Rock and Ft. Smith Railroad Co.* v. *Payne,* 33 Ark. 816.)  I cannot see any distinction, either in principle or under the authorities.  It seems to me that there is ample justification, both in reason and in authority, to hold this statute constitutional in the respects here considered.

Mr. JUSTICE FARMER, also dissenting.