## INGALLS v. MAINE CENT. R. CO. et al.

District Court, D. Maine, S. D. February 7, 1928.

No. 850.

1. Commerce ☞92—Question of construction of published tariffs, as applied to certain shipments, is within jurisdiction of courts.

Where the question involved is construction of published tariffs and their application to certain shipments, it is one for the courts, and not for the Interstate Commerce Commission.

2. Carriers ☞35—Carrier and shipper cannot contract for interstate rates, but only for transportation at legal rates.

Parties to interstate shipments are not free to contract as to rates, but only for transportation at legal rates.

3. Carriers ☞30, 35—Where published tariffs established through rates on interstate shipments between two points, they are the only legal rates; published rates cannot be avoided by bills of lading over intrastate line and rebilling.

Where there were published through rates between points of shipment and point of destination, where consignee had long been in business and receiving shipments, as was known to the parties, such rates must govern, and this cannot be avoided by issuing bills of lading to an intermediate junction point, from which the carriage is entirely over an intrastate line, and there rebilling.

24 F.(2d)—8

At Law. Action by Willis E. Ingalls against the Maine Central Railroad Company and the Bridgton & Saco River Railroad Company. Judgment for plaintiff.

John W. Hill, of Portland, Me., for plaintiff.

George E. Fogg, of Portland, Me., for defendants.

PETERS, District Judge. This is an action to recover alleged overcharges paid by the plaintiff to the defendant railroads on certain carload shipments of grain, all of which originated at Western points outside of Maine and were moved to Bridgton, Me., being transferred from the Maine Central Railroad Company to narrow gauge cars of the Bridgton & Saco River Railroad Company at Bridgton Junction, Me. The alleged overcharges were in the freight from Bridgton Junction to Bridgton, a wholly intrastate route. The rates charged and collected by the carriers were the through rates to Bridgton Junction plus the local rates from the latter point to Bridgton, which local rate is higher than the "arbitrary" assigned as a component part of the through rate to Bridgton.

The plaintiff claims to be entitled to the through rate to Bridgton, which raises the question whether these shipments should have been considered as through shipments in interstate commerce from Western points to Bridgton, or whether the interstate character of the shipments ceased at Bridgton Junction.

Certain phases of the case were referred to an auditor, to whose report the defendants filed exceptions, and demurrers have been filed and overruled. I regard all preliminary questions raised by the defendants as without substantial merit, and consider that the decisive question is, as above indicated, whether the grain shipments were actually, and entitled to be treated as, through shipments to Bridgton, or whether the railroad companies, defendants, were justified in treating them as through shipments to Bridgton Junction, and local when taken by the Bridgton & Saco River Railroad Company from Bridgton Junction to Bridgton.

[1] The point is made by the defendants that this is an administrative question, that should be decided by the Interstate Commerce Commission, and that this court, under the Commerce Act, has no jurisdiction. This suit, however, involves only a construction of the published rates of the carriers and their application to certain shipments. Here, as in the case of Great Northern R. Co. v. Merchants' Elevator Co., 259 U. S. 285, 42 S. Ct. 477, 66 L. Ed. 943, "the task to be

performed is to determine the meaning of words of the tariff, which were used in their ordinary sense, and to apply that meaning to the undisputed facts." See also Gimbel Bros. v. Barrett (D. C.) 215 F. 1004.

There were through rates established and effective, filed with the Interstate Commerce Commission, applicable to shipments of grain from points of origin in this case to Bridgton. Where a through rate is in effect between two points, that is the only legal rate between those points under the Commerce Act.

There were 27 shipments in question, all grain in carload lots, and all finally delivered in Bridgton and there handled by the plaintiff in his business. He had no place of business at Bridgton Junction and there was no grain elevator there. In eighteen of the shipments the destination named in the original bill of lading was Bridgton Junction. In the other nine it was Bridgton. The grain was all purchased by the plaintiff f. o. b. Bridgton Junction, and was all waybilled to Bridgton Junction. In fact, it had to be, by the provisions of the published through tariffs. All shipments were "order notify" shipments, and in all cases the bills of lading were either canceled at Bridgton Junction, or, if at Bridgton, for and on account of the agent at Bridgton Junction, and were filed and remained with him.

New straight shipments were then made at the request of the plaintiff over the narrow gauge railroad to Bridgton. The grain is transferred by the latter railroad to its own cars at its own expense and at that time the owner has a privilege of inspection, which is valuable to him, because, as he explained, if the grain in a car has heated, for instance, it is easier to send it back while in the large cars before transfer to the smaller cars of the narrow gauge railroad. The practice and requirements of the railroads met the wishes of the plaintiff in all respects. In fact, the whole proceeding of canceling the bills of lading at the junction and sending on the grain by new straight shipments at local rates over a local road appear to have been satisfactory to the plaintiff, desired by him and to have been his custom for some eighteen years, nor would this suit apparently have been brought if some commercial agency, experienced in this kind of business, had not taken a probably not altogether altruistic interest in the possible rights and obligations of the parties under the Commerce Act. All the details of shipments and handling of this grain from start to finish were in accordance with the contracts of transportation with the plaintiff.

[2] However, it is clear that the parties are not free to contract, as they were before the passage of the Commerce Act. "The contract between carrier and shipper is no longer a contract as to rates; it is merely a contract that the carrier will render transportation service when the shipper pays the legal rate. When the transportation is interstate, the interstate rate is the legal rate, and that rate must be demanded and paid, for both the carrier and shipper are charged with notice of it." McFadden v. Alabama Great Southern Ry. Co. (C. C. A.) 241 F. 562.

[3] All the grain involved in these shipments was actually moved from Western points to Bridgton and physically delivered to the plaintiff there. It was intended by the plaintiff to have it come to Bridgton, where he had his only place of business for that purpose, and that fact—that the plaintiff did business solely at Bridgton, and had done so for many years—was known to the agents of both railroads. The custom seems to have been for one railroad company to pay the freight charges of the other, charge them as "advances," and present the entire bill to the plaintiff at Bridgton when it was paid.

The essential character of this transaction, being the same whether the bill of lading read Bridgton or Bridgton Junction, and being typical of similar transactions for years between the same parties, it seems to me must be held to be a through movement of freight to Bridgton, under the decisions of the Supreme Court. Among other points urged by the defendants is that the ultimate destination of these cars was not certain—beyond Bridgton Junction. They might be sold en route, and they might be sent back, which is true. But it was never more than a possibility that the interstate journey would end at Bridgton Junction. All these 27 cars during the period in question went to Bridgton. See the Settle Case, below mentioned. The criterion can be applied in this case that was applied by the Supreme Court in the case of Baltimore, etc., Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189, a recent and authoritative case on the question:

"The rights of shipper against carrier are determined by law through the provisions of the tariff which are embodied in the applicable published rate * * * and whether the interstate or the intrastate tariff is applicable depends upon the essential character of the movement. That the contract between shipper and carrier does not necessarily determine the character was settled by a series of cases in which the subject received much consideration. Southern Pacific Terminal Co. v. Interstate Commerce

Commission, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310. * * *

"Under these circumstances, the intention as it was carried out determined, as matter of law, the essential nature of the movement, and hence that the movement through to Madisonville was an interstate shipment; for neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk is an essential of a through interstate shipment. These are common incidents of a through shipment, and when the intention with which a shipment was made is in issue, the presence or absence of one or all of these incidents may be important evidence bearing upon that question. But where it is admitted that the shipment made to the ultimate destination had at all times been intended, these incidents are without legal significance as bearing on the character of the traffic."

It is unnecessary to repeat the references to the many other cases cited by the Supreme Court in the course of its opinion in the above case. Some other cases are at first difficult to reconcile with the Settle Case. The defendant points out one or two and relies upon them. One of them is Gulf, etc., Co. v. Texas, 204 U. S. 403, 27 S. Ct. 360, 51 L. Ed. 540. This case is referred to by Mr. Justice Brandeis in his opinion in the late Settle Case in this language:

"The decision in Gulf, C. & Santa Fé Ry. Co. v. Texas, 204 U. S. 403, 27 S. Ct. 360, 51 L. Ed. 540, relied upon by defendants in error, is entirely consistent with these later decisions of this court, *although some expressions in the opinion are not.*"

The defendant would make the matter of good faith in the contract of shipment—whether or not the contract is a device to defeat the statute—the distinction which harmonizes many of the decisions. It is not fitting here to try to formulate any general rule or necessary to advance a theory which may tend to harmonize cases. It is sufficient if the essential facts in this case appear to bring it clearly within the scope of the pronouncement in the recent Supreme Court case referred to, the Settle Case. Certainly the "essential nature of the traffic" here, as there, as "a through movement to the point of ultimate destination, is shown by the original and persisting intention of the shippers which was carried out." If the interstate commerce character of these shipments attached to them and continued to Bridgton, as it apparently did, the result follows automatically that the through rate must be used, because shippers and carriers are forbidden by the Commerce Act to make any transportation contracts involving any different rates, whether more or less. McFadden v. Alabama Great Southern R. Co. (C. C. A.) 241 F. 562; U. S. v. Wood (D. C.) 145 F. 405; Baer Bros. v. Denver & R. G. R. R. Co., 233 U. S. 480, 34 S. Ct. 641, 58 L. Ed. 1055.

It follows that judgment must be rendered for the plaintiff in the sum found by the auditor, $1,490.73, and interest from the date of the writ.