## UNITED STATES v. WERNER et al.
### No. 112, Docket 20389.

Circuit Court of Appeals, Second Circuit.

April 1, 1947.

2 Item 6 of the order on appeal should be so construed as not to contradict the jurisdiction reserved by item 7.

J. Bertram Wegman and Richard J. Burke, both of New York City (Myron L. Shapiro, of New York City, of counsel), for Kohn.

Louis Halle, of New York City, for Werner.

Keith Brown and John F. X. McGohey, U. S. Atty., Southern District of New York, both of New York City (William Koerner, of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The defendants, Werner and Kohn, were convicted of having possession with guilty knowledge of four cases of razor blades, which had been stolen from a warehouse in New York City, and were moving in foreign commerce.[1] On this appeal they raise six questions: (1) whether the evidence of guilty knowledge was enough to support the verdict; (2) whether the judge charged the jury adequately concerning circumstantial evidence; (3) whether he erred in excluding testimony as to the fair market value of the blades at the time the defendants bought them; (4) whether the blades were moving in foreign commerce when they were stolen; (5) whether they were stolen from one of those places prescribed in the statute; (6) whether they were embezzled and were not on that account within the meaning of the statute. The facts, as the jury might have found them from the evidence, were as follows. In April, 1944, the Personna Blade Co. Inc., of Plattsburg, New York, made a contract with the British "Ministry of Supply Mission" to make and deliver for the British armed forces approximately a thousand gross of razor blades, at $12 a thousand. The Personna Company was to make the blades especially for this contract and was to deliver them at a warehouse at Kingsbridge, New York City, properly cased and marked and ready for export to various places abroad; but the "Supply Mission" reserved the privilege of examining them to see that they corresponded with the specifications. The difficulties of shipment were such that cases might remain in the warehouse at Kingsbridge for periods of time, amounting to six weeks or more, before an opportunity arose to forward them abroad. The Personna Company shipped the four cases in question by truck to Rensselaer, New York, where they were turned over to a second carrier, who took them to its terminal in New York,

---

[1] § 409. Title 18 U.S.C.A.

whence they were to be delivered to Kingsbridge by a third carrier. For some reason not disclosed, after reaching the second carrier's terminal, they were not taken to Kingsbridge, but were delivered with other merchandise to the warehouse of J. & M. O'Neill, Inc., on Beekman Street, New York. Whether this misdelivery was a theft, or resulted from mistake, does not appear.

A man named Cannet was O'Neill's receiving clerk, and after examining the first case, he stored all four in the warehouse, made no entry of their arrival in O'Neill's records, and told no one in the company that they had been received. On the 9th, he gave a sample package of the blades taken out of the first case to Moresco, a truck driver for another trucker; and Moresco took this sample to the defendant, Werner's warehouse. Moresco had delivered merchandise to Werner in the past, and he offered to sell him the blades at prices at which Werner later bought them and which averaged a little more than $4.50 a thousand. He told Werner that the cases were an overshipment; and when Werner asked him whether they had been stolen, said they had not been. Werner at first refused to buy them himself, but he called up the defendant, Kohn on the telephone and told him that he could sell him Personna blades for $6 a thousand. Kohn, who did a wholesale drug business in Newark, said he would buy them, and would go to New York the next day to take delivery. On May 10th, Kohn drove to Werner's place in New York and examined the blades in three cases. They were like ordinary razor blades, and unlike the Personna Company's blades on the American market, which were of much higher quality and sold for $50 a thousand. Werner and Kohn agreed upon a price of $5.75 a thousand; Kohn opened the cases, counted the cartons, and took two cases back to Newark in his motor car. An employee of Werner went with him, to whom he paid $710.50 in cash for all three cases; and on the same day Kohn returned to New York and got the third case. On the 11th, Moresco delivered the fourth case to Werner, who sold it to Kohn on the 12th and he paid for it this time by cheque.

Kohn and his father immediately set about selling the blades. They sold about 44,000 for $12 or $16 a thousand; and tried to sell the remaining 100,000 at auction in Newark, at a minimum price of $16 a thousand. In this they were unsuccessful, and on the 20th Kohn undertook to sell the blades to the Personna Company itself through one of its employees, Marcus, with whom he was acquainted. Marcus wished to get the blades off the market because, being inferior, he feared that they would hurt the sale of the high quality Personna blades; so he asked Kohn to rebuy from the retailers those which he had sold, and offered to pay $25 a thousand for them. Marcus then went to Newark, and examined the blades which Kohn still had; and in answer to his inquiry Kohn told him that they had been honestly acquired, assuring him that he had bills of sale for all of them, which was of course false. Apparently by the 24th Marcus learned that the blades had been stolen; at any rate he replevied more than 100,000 on behalf of the Personna Company; Kohn at once informed Werner; and on the same day they both had an interview in a restaurant with Cannet—whom neither had as yet met—and with Moresco—whom Kohn had never met. Kohn and Werner demanded a bill of sale or a way-bill to prove that the blades had not been stolen; and told Cannet and Moresco that with such documents in hand they might be able to recover $25,000 from the Personna Company because of the suit. They added that a bill of sale was "just a piece of paper," and Kohn said that its production "was the only thing that would save them." Again, on June 3rd, they called up Cannet and tried to get him to give them a bill of sale. He refused, and Werner then threatened him with disclosure.

If the case against Kohn had depended only upon the circumstances of his purchase of the cases from Werner, it might be argued with some show of plausibility that there was not enough evidence of guilty knowledge to support the verdict, although the transaction was certainly sus-

picious. However, if the jury chose to believe Cannet's and Moresco's testimony about the interviews after Marcus had replevied the cases, they were certainly justified in finding that, at least by that time, both Kohn and Werner were aware that the goods had been stolen. The fabrication of false documentary evidence, which they then suggested to Cannet, has from the earliest times been treated as strong evidence of guilt.[2] Moreover, as to Kohn there was the added testimony that he had falsely asserted to one of the retailers and to Marcus that he had bills of sale for the cases. If it be answered, that this evidence did not relate back to the time when Kohn received the cases, there are two answers. First, the jury might well conclude that nothing had happened after Kohn had received the cases, to open his eyes, and that they might therefore relate back his knowledge. Second, the statute is in the alternative: it defines the crime as either receiving, or possessing, goods with guilty knowledge, and even though the goods had been innocently received, when Kohn later learned that they had been stolen and retained them, he committed the crime.

The evidence against Werner was stronger. He started with the presumption against him always attending the possession of recently stolen property;[3] and he neither took the stand, nor offered any evidence in his favor. On the other hand several of the witnesses upon cross-examination by his counsel testified to exculpatory matters; and perhaps that relieved him of the presumption. It would seem a rigorous requirement to demand for that result that evidence must be formally designated as part of the case of the party against whom the presumption operates. However that may be, and even though we assume that the testimony we mention did relieve Werner of the presumption, there was evidence enough to charge him with guilty knowledge. Although he had lost possession of the goods, at the time of the interview with Cannet and Moresco, as in the case of Kohn, the jury might relate back to his guilt which he then disclosed; and, besides that, the circumstances of his original purchase were alone enough to support the verdict. Moresco was a truckman and truckmen do not honestly become the owners of cases of goods worth $800 which they peddle about without any documents of title. That Werner had already become suspicious appears from his question to Moresco when he bought; and that suspicion was too readily allayed by the assurance, with nothing to back it up, that a friend of Moresco, who was a receiving clerk, had the cases as "over" delivery. Nobody but a child would have been so fobbed off.

■ The defendants ask us to distinguish between "knowing" that goods are stolen and merely being put upon an inquiry which would have led to discovery; but they have misconceived the distinction which the decisions have made. The receivers of stolen goods almost never "know" that they have been stolen, in the sense that they could testify to it in a court room. The business could not be so conducted, for those who sell the goods—the "fences"—must keep up a more respectable front than is generally possible for the thieves. Nor are we to suppose that the thieves will ordinarily admit their theft to the receivers: that would much impair their bargaining power. For this reason, some decisions even go so far as to hold that it is enough, if a reasonable man in the receiver's position would have supposed that the goods were stolen. That we think is wrong; and the better law is otherwise,[4] although of course the fact that a reasonable man would have thought that they had been stolen, is some basis for finding that the accused actually did think

---

[2] Wigmore, § 278.

[3] Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Rosen v. United States, 2 Cir., 271 F. 651; Drew v. United States, 2 Cir., 27 F.2d 715; Husten v. United States, 8 Cir., 95 F.2d 168; United States v. Bollenbach, 2 Cir., 147 F.2d 199 (The reversal of this decision, 326 U.S. 607, 66 S.Ct. 402, did not touch this point).

[4] Peterson v. United States, 9 Cir., 213 F. 920, 922; Kasle v. United States, 6 Cir., 233 F. 878, 888; Pounds v. United States, 7 Cir., 265 F. 242, 245; Stemple v. United States, 4 Cir., 287 F. 132.

442

so.[5] But that the jury must find that the receiver did more than infer the theft from the circumstances has never been demanded, so far as we know; and to demand more would emasculate the statute, for the evil against which it is directed is exactly that: i.e., making a market for stolen goods which the purchaser believes to have probably been stolen.

The second objection is that the judge was not specific enough in his charge to the jury about circumstantial evidence. He followed the established rubric as to "reasonable doubt," and then dealt with the question of circumstantial evidence in the passages which we quote in the margin,[6] and which was entirely adequate. The objection is frivolous and does not deserve discussion.

We shall postpone for the moment considering the exclusion of the testimony as to the value of the blades, and take up the question whether they were moving in foreign commerce. The situation was different from that of goods merely sent by the seller upon approval by the buyer. The contract had been made, the goods had been manufactured and cased for export, and had been shipped as delivery. If in fact they conformed to the specifications, the buyer was obliged to accept, and would speed the goods on their way as opportunity offered. Although the buyer reserved the privilege to inspect and reject, that would affect their continued journey only in case the seller had not in fact performed, and as to these shipments the seller had performed. Any interruption of the journey was therefor certain to be temporary and the cases were certain to go forward. The mere physical interruption, awaiting a bottom in which to ship, did not break what would otherwise have been a continuous foreign journey begun at Plattsburg;[7] nor did it break the journey that the buyer had the privilege of inspection during the journey, and not at its beginning or its end.[8]

The next objection is based upon the concluding sentence of the statute which was added in 1925;[9] i.e., whether the "stolen" goods must be taken from a "station-house" etc. of the person who had the goods in his "custody." Were it not for the use of the word, "including," it would be easy to find a meaning for this: i.e., the theft must be from some receptacle belonging to the person who had custody of the goods; and perhaps that is what it does mean, despite the inappropriateness of the word "including," as a definition. Be that as it may, the record at bar does not present the question whether "including" was used to exclude all else. The carrier's truckman delivered the cases upon O'Neill's platform, and there is no reason to suppose that he was Cannet's accom-

[5] Sellers v. United States, 4 Cir., 299 F. 258.

[6] "The burden is on the Government to prove that the defendants had knowledge. Of course, knowledge of that kind is not something that you can see with the eye or touch with the fingers. It is seldom possible to prove it by direct evidence. You cannot look into a person's mind and determine what existed at a given time, especially in the past. Generally it is necessary to show knowledge by acts and conduct. You yourselves may acquire knowledge from what you see with the eye, feel with the fingers, or hear with the ear, or sense by smell with the nose. But you can only appraise the state of mind of another person from a consideration of his conduct.

"In other words, you should take into consideration in your deliberations here not only the direct evidence bearing on it, but all of the facts relating to the defendants' connection with the transaction so far as they may have been disclosed by the testimony or the reasonable import to be deduced therefrom.

"In other words, it may be a matter largely of circumstantial evidence which often is quite as reliable as direct evidence and in some circumstances might be even more reliable."

[7] Walling v. Jacksonville Paper Company, 317 U.S. 564, 63 S.Ct. 332, 87 L. Ed. 460.

[8] Powell v. United States, 4 Cir., 112 F.2d 764, 766; Shellabarger Elevator Co. v. Illinois Central R. Co., 278 Ill. 333, 116 N.E. 170, L.R.A.1917E, 1011; Ingalls v. Maine Central R. Co., D.C.Me., 24 F. 2d 113; Brunner v. Mobile-Gulfport Lumber Co., 188 Ala. 248, 66 So. 438, is contra, but it was decided before United State v. Erie Railroad, 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187, and is in conflict with it.

[9] 43 Stat. 793.

plice. However, it would make no difference if he was, for the delivery to Cannet was from a truck, the truckman's employer had custody of the goods, and the statute mentions a "truck" as one of the receptacles. If, on the other hand, the truckman was not Cannet's accomplice and delivered the cases by mistake, he meant to deliver them to O'Neill, not to Cannet, and the delivery was completed when he dumped the cases upon O'Neill's platform. Cannet could not have formed the intention to steal them until he was aware of the mistake, and that could scarcely happen before they had been dumped upon the platform and had come into O'Neill's custody. Moreover, if Cannet did learn of the mistake while the cases were still on the truck, he "stole" them when he availed himself of that mistake by accepting delivery of them from the truck. Thus, in any view they were stolen from one of the receptacles described in the statute. We need not consider separately the question whether Cannet committed larceny or embezzlement, for we have already decided that in either event he "stole" them within the meaning of the statute.[10]

■ From what we have said so far it would follow that the convictions should be affirmed, and so they would be but for the last objection: the exclusion of the testimony of experts as to the value of the blades. In prosecutions for receiving stolen property for obvious reasons one of the most telling indices of guilt is a low price paid by the receiver. Thieves are in no position to bargain; they must rid themselves of their loot as quickly as possible and their willingness to sell cheap betrays, or should betray, their predicament. On the other hand evidence that the receiver paid the right price, or close to the right price, for the goods is equally persuasive of his innocence; for no one is likely to incure the risk of buying stolen goods, who has little to gain. This the prosecution does not deny; it defends the judge's ruling on the ground that he did admit some testimony of the value of the blades; and that the offer was only of their market value which was necessarily

hypothetical as they had no domestic market. We cannot accept either as an adequate excuse. The judge ruled out testimony as to the market value of persons particularly qualified to know what the blades should bring, which was far more probative than that which got in. Moreover, it was no answer to say that there was no market and that their opinions were hypothetical; for, except when established by markets, like stock or produce exchanges, value is usually nothing more than an honest guess, estimate, or surmise. For that very reason it was important to know how nearly the defendants' guess corresponded with that of those best versed in the matter. Once more we wonder at the readiness of prosecutors to risk a conviction upon a doubtful ruling; once more we repeat that the probative remoteness of testimony is never alone an absolute reason for its exclusion, but should always be accompanied by some other objection if it is to prevail; such as the confusion which may result or the emotions it may arouse to disturb impartial decision. So long as the entirely discretionary admonition to keep the trial within practical limits is treated as a peremptory rule, so long will trials continue to go astray; in cases of any doubt the right course is not to exclude.

As to Kohn the error was of the most serious kind; because, as we have said, except for the testimony of Cannet and Moresco the case against him was thin. True, the jury believed these two confessed criminals, but who can say that, if they had been persuaded that Kohn had paid Werner nearly the full price of the blades, it might not have raised a doubt in the minds of some of them at least. It is more doubtful whether the testimony would have helped Werner, against whom the evidence was so much stronger. Nevertheless had the jury believed that the market value of the blades was only $6 a thousand, for which Werner paid Moresco $4.50, we can hardly be sure that so small a "spread" might not have raised doubts enough at least to split the panel. We should have confined our discussion to this question, if

---

[10] United States v. Handler, 2 Cir., 142 F.2d 351, 352; United States v. De Normand, 2 Cir., 149 F.2d 622, 624.

its decision had disposed of the prosecution; but, since we cannot be sure that the case will not be tried again, we have passed upon all the other objections; even of one or two which may not arise upon a second trial.

Judgments reversed; new trial ordered.