978 So.2d 374 (2007)
STATE of Louisiana
v.
Karen Marie CALLOWAY.
No. 2007 KA 0012.
Court of Appeal of Louisiana, First Circuit.
November 7, 2007.
*375 Joseph L. Waitz, Jr., District Attorney, Barry Vice, Ellen Daigle Doskey, Assistant District Attorneys, Houma, LA, for Appellee, State of Louisiana.
Gwendolyn Brown, Baton Rouge, LA, for Defendant/Appellant, Karen Marie Calloway.
Before PETTIGREW, DOWNING, and HUGHES, JJ.
HUGHES, J.
Defendant, Karen Marie Calloway, and the codefendant, her seventeen-year-old son Demond Kentrell Calloway, were charged by bill of information with illegal possession of stolen things having a value greater than $500.00, violations of La. R.S. 14:69. They pleaded not guilty. A jury found Demond not guilty and Ms. Calloway guilty as charged. She filed motions for new trial and for judgment notwithstanding the verdict, but these were denied. She was sentenced to three years imprisonment at hard labor. Her motion for reconsideration of the sentence was denied, as was her request for an appeal bond. She now appeals, designating the following six assignments of error:

Assignment of Error No. 1
The evidence is insufficient to support the conviction as it is based upon circumstantial evidence and the State failed to exclude every reasonable hypothesis of innocence.

Assignment of Error No. 2
The trial court erred by denying Ms. Calloway's motion for judgment notwithstanding the verdict.

Assignment of Error No. 3
The trial court erred by denying Ms. Calloway's motion for new trial.

Assignment of Error No. 4
The trial court erred by imposing an excessive sentence.

Assignment of Error No. 5
The trial court erred by denying Ms. Calloway's motion to reconsider sentence.

Assignment of Error No. 6
The trial court erred by denying Ms. Calloway's motion for appeal bond.
For the following reasons, we reverse the conviction and sentence.

FACTS
When Hurricane Katrina struck the New Orleans area on August 29, 2005, Ms. Calloway, her boyfriend Travis Williams, her teenaged son Demond, her asthmatic ten-year-old daughter Kashawn, her seven months' pregnant "sister-in-law" Stephanie Williams, and a teenaged female neighbor named Keesa, were living in her apartment in Marrero. The group remained at the Marrero apartment for two days without electricity or a working phone, then decided to try and reach the Superdome to seek shelter when their supplies began running low, and looting and robberies were occurring in the neighborhood. They walked and hitched a ride to the Crescent City Connection bridge area, where the women stayed to rest while the men went to the Superdome. But the men were turned away by police at the Superdome and the family had to spend the night on the bridge. The men tried again the next day to reach the Superdome but were again turned away.
By that time, the family had run out of food and water and the situation on the bridge was deteriorating rapidly. They saw fighting, heard screaming, and learned that rapes and robberies were going on. Demond witnessed a stabbing over water that a man was saving for his infant. When a stranger tried to grab at Ms. Calloway's young daughter Kashawn, the *376 family decided to return to their Marrero apartment.
When they returned home, their apartment had been broken into and their remaining food and water had been stolen. The door and windows had been kicked open and the family adults took turns during the night standing guard over the children. During the night, they heard screaming and gunshots around the area. There were no police. As the looting continued throughout the night in her neighborhood, Ms. Calloway began fearing for her and her family's safety since they had no food, electricity, water, or use of a phone. They had also heard that the nearby Harvey Canal might overflow.
The next day, a neighbor told Ms. Calloway that some men were at a location about half a mile away selling cars. Ms. Calloway and her son Demond walked over to look at the cars. They spoke to a man named "Reggie," who Ms. Calloway had heard around the neighborhood usually had cars to sell. Reggie had five or six vehicles and suggested that he would sell Ms. Calloway a Toyota Solara, but she wanted to purchase a Toyota Tundra pickup that Reggie had, thinking it would hold more people and belongings. Reggie was reluctant to sell the truck, indicating that he needed it, but the two continued negotiating. Ms. Calloway had to return home because her daughter had an asthma attack.
When Ms. Calloway returned to Reggie, she gave him $2,200.00,[1] for which she expected to buy the Tundra pickup. Instead, and to her surprise, Reggie gave her the keys to both the Tundra and the Solara. Reggie told Ms. Calloway that he did not have the sale documents available at that moment, but that he would either send the documents to the Houma address Ms. Calloway provided or bring them to her himself. Ms. Calloway later testified that at the time, she did not concern herself overly with the paperwork due to the chaos of the situation. Similarly, she did not suspect the vehicles were stolen because Reggie had the keys to both when he sold them to her and the vehicles did not look to have been broken into or hotwired.
After acquiring the two vehicles, Ms. Calloway packed up her family and their belongings and they drove the Tundra and the Solara to Houma, where they stayed with Ms. Calloway's mother. About two months later, detectives from the Houma Police Department received a tip that led them to discover that the Solara and Tundra were stolen vehicles owned by Dr. Dimetry Cossich and Kevin Adams, respectively.
At the trial, Dr. Cossich, a dentist, testified that he purchased a new 2004 Solara for about $32,000.00 from Don Bohn Toyota on LaPalco Boulevard in Harvey. Before the hurricane hit, Dr. Cossich had brought the Solara to the dealership for a minor repair to a window. When the hurricane struck, Dr. Cossich evacuated, leaving the Solara at the dealership. Dr. Cossich testified that before the hurricane, the Solara was in excellent condition and had about 24,000 miles on it.
The facts concerning Mr. Adams's Toyota Tundra are similar. Mr. Adams testified that he purchased the 2003 Tundra new for about $30,000.00 from Bohn Brothers Toyota on LaPalco Boulevard in Harvey. Prior to the hurricane, Mr. Adams brought the Tundra to the dealership to have the power steering repaired. When the hurricane struck, Mr. Adams evacuated, leaving the Tundra at the dealership. *377 He testified that before the hurricane, the Tundra was in excellent condition and had about 40,000 miles on it.
Both Dr. Cossich and Mr. Adams testified that they attempted to make a stolen vehicle report with Jefferson Parish authorities but were unable to do so. Dr. Cossich testified that the police advised him that they were not taking stolen car claims at that time.
Ms. Calloway testified that when she bought the Tundra pickup from Reggie, it was not severely damaged, but it was in only fair condition. She testified that the Solara had key marks on it, the sunroof was cut, there were dents in it, and the floor was wet. Travis Williams, Ms. Calloway's boyfriend, also testified that the vehicles were not in excellent condition. He reported that the Solara was "keyed up," the sunroof was cut open, the rearview mirror was broken off, and it had water damage to the interior. He testified that the Tundra had a flat tire and the stereo system had been ripped out, which left all the stereo wires hanging and exposed.
Ms. Calloway testified that while she did not purchase the vehicles from a known car lot, Reggie was known for selling vehicles in the back of the neighborhood.[2] She did not have a driver's license and prior to purchasing these two vehicles, she had never owned or purchased a car before. Thus, she testified, she had no way of knowing the retail value of the vehicles she purchased. She testified that it never crossed her mind that the vehicles were stolen. They did not look broken into or hot-wired and she thought that since the levee was getting ready to break, Reggie was trying to get rid of the cars "now and get something for it, or let the rain hit it and water take it away and get nothing for it."
In Houma, Ms. Calloway never altered or changed the Tundra's license plate or attempted to disguise or camouflage the vehicle in any way. Demond testified that he regularly drove the Solara to school and to work while in Houma after the hurricane. He testified that he had no idea the car was stolen. The price paid for the vehicles did not concern him and he did not discuss it with his mother. Ms. Calloway testified it was her understanding that Reggie was coming to Houma and would then give her the title to the vehicles. As it turned out, Reggie never did go to Houma and when Ms. Calloway went back to Marrero and looked for him, he was gone.
Jeff Walters, who qualified at the trial as an expert on appraising automobiles, testified on direct examination that a used 2004 Solara in excellent condition with 24,000 miles and features similar to those of Dr. Cossich's Solara would bring between $22,000.00 and $24,000.00 at an auction. If sold by a private individual, it would sell for between $24,000.00 and $27,000.00. Mr. Walters also testified that a 2003 Tundra, used but in excellent condition with 40,000 miles and features similar to those of Mr. Adams's Tundra, would have a wholesale value of $17,000.00 and a retail value as high as $20,500.00. On cross-examination, Mr. Walters testified that a $20,000.00 vehicle that was water-damaged would likely sell for "twenty-five cents on a dollar, at worst" or roughly $5,000.00. He was also asked on cross-examination: "[i]f, in fact, the vehicles were waterlogged, had some engine-power steering, the interior was trashed, maybe a little damaged, would it come a point where you would not pay a penny for those vehicles?" He responded, *378 "In my current position, I would not."

ASSIGNMENTS OF ERROR NOS. 1, 2, AND 3
In her first three assignments of error, Ms. Calloway argues that the evidence was not sufficient to support her conviction. Specifically, she contends that the State failed to prove the elements of intent or knowledge that the vehicles were stolen when, in fact, she reasonably believed that she legally acquired the vehicles.
A conviction based on insufficient evidence cannot stand as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See La.Code Crim. P. art. 821(B). Incorporated into Article 821 is the standard of review articulated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. Furthermore, when analyzing circumstantial evidence, Louisiana Revised Statutes 15:438 provides that the trier of fact must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 2001-2585, pp. 4-5 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 144.
Louisiana Revised Statutes 14:69 provides in pertinent part:
A. Illegal possession of stolen things is the intentional possessing, procuring, receiving, or concealing of anything of value which has been the subject of any robbery or theft, under circumstances which indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses.
Thus, the three elements of the crime of illegal possession of stolen things are: (1) intent, (2) possession, procurement, receipt, or concealing of stolen goods, and (3) knowledge that the goods were stolen. State v. Mangrum, 509 So.2d 818, 820 (La.App. 1 Cir.1987). Illegal possession of stolen things is a general intent crime. See State v. Davis, 371 So.2d 788, 790 (La.1979). General criminal intent is present when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2). Though intent is a question of fact, it may be inferred from the circumstances of the transaction. See Davis, 371 So.2d at 790.
In State v. Chester, 97-1001, p. 3 (La.12/19/97), 707 So.2d 973, 974 (per curiam), the Louisiana Supreme Court stated:
[J]urors may infer the defendant's guilty knowledge from the circumstances of the offense. See Barnes v. United States, 412 U.S. 837, 843, 93 S.Ct. 2357, 2362, 37 L.Ed.2d 380 (1973) ("For centuries courts have instructed juries that an inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods."). The inference of guilty knowledge arising from the possession of stolen property is generally a much stronger one than the inference the possessor committed the theft, Cosby v. Jones, 682 F.2d 1373, 1381 (11th Cir.1982), and for the buyer and seller alike, in a transaction involving stolen goods, "one of the most telling indices of guilt is a low price paid by the *379 receiver." United States v. Werner, 160 F.2d 438, 443 (2d Cir.1947); see 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law, § 8.10, p. 430 (West 1986) ("The circumstance that the buyer paid an inadequate price for the goods, that the seller was irresponsible, that the transaction between them was secret-these factors all point toward . . . guilty knowledge."); see United States v. Prazak, 623 F.2d 152, 154-55 (10th Cir.1980) [cert. denied, 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980)] ("Acquisition of recently stolen property at a ridiculously low price from an unknown person is itself sufficient to support an inference that the one acquiring the property knew the property was stolen."); State v. Butler, 9 Ariz. App. 162, 450 P.2d 128, 132 (1969) ("When . . . there is other evidence in addition to possession and sale at a disproportionately low price guilty knowledge may be found."); Russell v. State, 583 P.2d 690, 699 ([Wyo.] 1978) (Thieves "must rid themselves of stolen property as quickly as possible, and willingness to sell at a grossly reduced price betrays or should betray such a predicament.").
Application of the Chester precepts to the instant matter convinces us that a rational trier of fact could not have concluded that the evidence as admitted excluded a reasonable hypothesis that Ms. Calloway had no knowledge that the vehicles were stolen. While she did pay a reduced price for the vehicles, uncontroverted trial testimony established that at the time of purchase, both vehicles had damage that would have lowered their prices, including water damage to the Solara. Mr. Walters, the appraisal expert, testified on cross-examination that water damage could cause a vehicle to lose up to three-quarters of its value. Further on cross, Mr. Walters indicated that he would pay nothing for a water-damaged vehicle with any additional damage, such as to the interior or the power steering.
The evidence further suggests that the disparity between the estimated value of the vehicles when Ms. Calloway first saw them (already damaged) right around the time of the hurricane and the price she paid for them was not so great that it should have been readily apparent to an unsophisticated buyer such as herself. She had no driver's license and had never owned or purchased a car before. Accordingly, as she testified at trial, she had no way of knowing the value of the vehicles she purchased.
Also, the circumstances under which Ms. Calloway purchased the vehicles are particularly relevant. The area was swiftly descending into total chaos around her and her family. She negotiated a price with and purchased the vehicles from Reggie, a man she knew to be in the business of selling used vehicles in the area. The purchase was not secretive, but was conducted in a public location in Ms. Calloway's neighborhood. Testimony suggests that when Ms. Calloway was negotiating with Reggie, it appeared that Reggie had about five or six other vehicles to sell and other people were also there trying to purchase vehicles.[3]
Furthermore, Ms. Calloway testified that when she purchased the vehicles for $2,200.00 together, it did not cross her mind that they were stolen. She testified that since everyone thought the levee was getting ready to break, she figured Reggie would "sell them anyway he can other than *380 lose all the interest on them, everything. So he's looking at I can get rid of them now and get something for it, or let the rain hit it and water take it away and get nothing for it." Finally, Ms. Calloway and Demond's actions and conduct following the purchase of the vehicles supports her claim that she did not believe the vehicles were stolen.
Once Ms. Calloway and her family arrived in Houma, they did not alter or change the license plates or attempt to disguise or camouflage the vehicles in any way. They used the vehicles openly until they learned from the Houma police that the vehicles were in fact stolen. Regarding the lack of paperwork for the purchase of the vehicles, Ms. Calloway's claims are supported by her testimony that she believed Reggie, based on his assurances, was going to come to Houma to give her papers and the title to the vehicles. She testified she returned to Marrero and looked for Reggie but could not find him. Although it is true that Reggie never came to Houma to give her the papers and had disappeared by the time she went back to ask for them, her assertions as to her state of mind and understanding at the time and under the circumstances are reasonable.
In a similar vein, Demond testified that while he was in Houma, he drove the Solara to high school and to work. When he parked at home, he never tried to conceal the car. He did not discuss the price paid for the vehicles with his mother. When asked whether he had any indication that the vehicle he used was stolen, Demond testified, "No. My momma wouldn't give me no keys to no stolen car." When asked what he thought "those guys were doing when they were selling those vehicles like that," Demond responded, "I thought it was a light out of heaven. I thought we finally about to leave. You, know, we finally about to get out. I thought it was a light out of heaven."
Officer Dennis Bourdreaux testified regarding an occasion when he had to confront Demond at Ellender High School in Houma about the car stereo in the Solara being too loud. Officer Bourdreaux confirmed that Demond was very respectful to him, and was not evasive in any way.
We have carefully reviewed the entire record. Under the facts of this case and in light of the credible testimony of Ms. Calloway and Demond, we conclude that any rational trier of fact, after viewing all of the evidence as favorably to the prosecution as possible, would have a reasonable doubt as to Ms. Calloway's guilt. Particularly, no rational trier of fact could have found that, under these circumstances, Ms. Calloway knew or had good reason to believe that the vehicles she purchased were stolen. See, e.g., State v. Mussall, 523 So.2d 1305, 1311-12 (La.1988). Proving a defendant's knowledgeable possession is an essential element of the crime of illegal possession of stolen things and it has not been shown here beyond a reasonable doubt as to Ms. Calloway Accordingly, the conviction and sentence are reversed.
The trial court erred in denying bail. Louisiana Code of Criminal Procedure Article 332 clearly states that "[a]fter sentence and until final judgment, bail shall be allowed if a sentence of five years or less is actually imposed" (emphasis added). Ms. Calloway should not have been incarcerated during the pendency of this appeal.
CONVICTION AND SENTENCE REVERSED.
PETTIGREW, J, Dissents, and Assigns Reasons.
*381 PETTIGREW, J., dissenting.
I dissent and would affirm the defendant's conviction and sentence for the following reasons.
In her first three assignments of error, the defendant argues the evidence was not sufficient to support her conviction. Specifically, the defendant contends that the State failed to prove the elements of intent or knowledge that the goods were stolen in that she reasonably believed that she legally acquired the stolen vehicles.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See La.Code Crim. P. art. 821(B). The Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 2001-2585, pp. 4-5 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 144.
Louisiana Revised Statutes 14:69 provides in pertinent part:
A. Illegal possession of stolen things is the intentional possessing, procuring, receiving, or concealing of anything of value which has been the subject of any robbery or theft, under circumstances which indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses.
The three elements of the crime of illegal possession of stolen things are: (1) intent, (2) possessing, procuring, receiving, or concealing stolen goods, and (3) knowledge the goods were stolen. State v. Mangrum, 509 So.2d 818, 820 (La.App. 1 Cir.1987). Illegal possession of stolen things is a general intent crime. See State v. Davis, 371 So.2d 788, 790 (La.1979). General criminal intent is present when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Davis, 371 So.2d at 790.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261, pp. 5-6 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932.
The testimony at trial established that Karen purchased two stolen vehicles from a man named Reggie in the back of her neighborhood allegedly for $2,200.00 in cash. There was no bill of sale or any other paperwork memorializing the transaction. Karen did not register or purchase automobile insurance for either vehicle. According to Karen, she wanted to *382 purchase only the Tundra, but when she gave Reggie the cash, Reggie gave her keys to both the Tundra and the Solara. Dr. Cossich testified that his 2004 Solara, purchased new for $32,000.00, was in excellent condition, and that his insurance company paid off his note for about $26,000.00 Kevin Adams testified that his 2003 Tundra, purchased new for $30,000.00, was in excellent condition, and that his insurance company paid him $23,000.00 for the truck.
In State v. Chester, 97-1001, p. 3 (La.12/19/97), 707 So.2d 973, 974 (per curiam), the Louisiana State Court stated:
[J]urors may infer the defendant's guilty knowledge from the circumstances of the offense. See Barnes v. United States, 412 U.S. 837, 843, 93 S.Ct. 2357, 2362, 37 L.Ed.2d 380 (1973) ("For centuries courts have instructed juries that an inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods."). The inference of guilty knowledge arising from the possession of stolen property is generally a much stronger one than the inference the possessor committed the theft, Cosby v. Jones, 682 F.2d 1373, 1381 (11th Cir.1982), and for the buyer and seller alike, in a transaction involving stolen goods, "one of the most telling indices of guilt is a low price paid by the receiver." United States v. Werner, 160 F.2d 438, 443 (2d Cir.1947); see 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law, § 8.10, p. 430 (West 1986) ("The circumstance that the buyer paid an inadequate price for the goods, that the seller was irresponsible, that the transaction between them was secret-these factors all point toward . . . guilty knowledge."); see United States v. Prazak, 623 F.2d 152, 154-55 (10th Cir. 1980) ("Acquisition of recently stolen property at a ridiculously low price from an unknown person is itself sufficient to support an inference that the one acquiring the property knew the property was stolen."); State v. Butler, 9 Ariz. App. 162, 450 P.2d 128, 132 (1969) ("When . . . there is other evidence in addition to possession and sale at a disproportionately low price guilty knowledge may be found."); Russell v. State, 583 P.2d 690, 699 (1978) (Thieves "must rid themselves of stolen property as quickly as possible, and willingness to sell at a grossly reduced price betrays or should betray such a predicament.").
While there was no direct or circumstantial evidence linking Karen to the theft of the vehicles, trial testimony provided jurors with direct evidence regarding the value of the vehicles. When the vehicles were stolen, the Solara was about one year old and the Tundra was about two years old. While the value of both vehicles combined, when purchased new, was about $62,000.00, and both vehicles were paid off by the rightful owners' insurance companies for a total of about $49,000.00, Karen purchased both vehicles for $2,200.00. While Karen testified that there was some damage to the vehicles when she bought them and that this was the first time she ever purchased any vehicle, it was not unreasonable for the jurors to infer that Karen should have been put on notice about a seemingly illegitimate transaction wherein she acquired two relatively new vehicles for an extraordinarily low price. Moreover, given the widespread looting and stealing at this time, and the fact that Karen acquired these vehicles with a complete lack of transactional formality at the back of her neighborhood from someone with whom there was no discussion about where or how he came to possess these vehicles, a reasonable juror could have inferred that Karen knew or had good reason to believe that the vehicles were stolen, and that she intended *383 to possess stolen things given her two-month use and possession of these vehicles. See Chester, 97-1001 at pp. 3-4, 707 So.2d at 974-975.
When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984). In finding the defendant guilty, it is clear the jury rejected the hypothesis of innocence presented by Karen; namely, that she reasonably believed that she legally acquired two stolen late-model vehicles for $2,200.00.
We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99-3342, p. 8 (La.10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La. App. 1 Cir.1985).
After a thorough review of the record, I am convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the illegal possession of stolen things having a value greater than $500.00.
The defendant's fourth and fifth assignments of error address the issue of excessive sentence. The defendant argues the trial court erred in imposing an excessive sentence and denying the motion to reconsider sentence.
Article I, § 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of Article 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is considered constitutionally excessive if it is crossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. State v. Andrews, 94-0842, pp. 8-9 (La.App. 1 Cir. 5/5/95), 655 So.2d 448, 454. The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. See State v. Holts, 525 So.2d 1241, 1245 (La.App. 1 Cir.1988).
The articulation of the factual basis for a sentence is the goal of Article 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with Article 894.1. State v. Lanclos, 419 So.2d 475, 478 (La.1982). The trial judge should review the defendant's personal history, his prior criminal record, the seriousness of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation through correctional services other than confinement. State v. Jones, 398 So.2d 1049, 1051-1052 (La.1981).
In the instant matter, the trial court imposed a three-year sentence at hard labor. *384 While the trial court did not mention Article 894.1 by name, it is clear from its reasons for judgment at sentencing that it considered the article. At sentencing, the trial court stated in pertinent part:
[The defendant] does not have a significant record. She had a previous receiving stolen goods, but that was some time in the past.
The Court is familiar that she has a family. She was working at the time this happened, and what is particularly troublesome to the Court is that she has steadily and steadfastly maintained that she thought she owned these vehicles, which from this Court's standpoint is just ludicrous under the circumstances. If she had come to this Court and said, look, Judge, we were in a bad situation, we needed to get out of Marrero because of the circumstances that were there, you know, while legally it is not a justification but certainly a lot of things happened during Hurricane Katrina, which certainly law enforcement was not going to get involved in given the circumstances, and the Court could have understood certain things. . . .
The story, in this case, is I bought two cars that are valued somewhere between 20- and $40,000. I have no papers, no title. I don't know who I bought them from. I didn't do a Bill of Sale. There was no notary, and I own two cars. And, simply, it does not wash under the circumstances of this matter.
The maximum sentence pursuant to La. R.S. 14:69(B)(1) is ten years imprisonment. Considering the trial court's careful analysis of the circumstances and the fact that the defendant was sentenced to only three years imprisonment, or less than one-third the possible maximum sentence, the sentence imposed by the trial court is not grossly disproportionate to the seventy of the offense and, therefore, is not unconstitutionally excessive. The trial court did not err in denying the defendant's motion to reconsider sentence.
For the above reasons, I would affirm the conviction and sentence of the defendant.
NOTES
[1] Testimony indicated that the Calloways had about $2,300.00 in cash at the time, most of which came from Ms. Calloway's husband's welding income.
[2] When asked on cross-examination if Reggie had a business office for the "car lot," the defendant responded, "[i]t was a house that had another little something going on in the shed, so I wouldn't  I didn't know what that part was."
[3] According to the testimony of the defendant and Demond, another man named "Slick" was with Reggie selling cars.